**Angela R. KING, Appellant,**

v.

**UNITED STATES, Appellee.**

**Darryl A. MANNING, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 86–1400, 86–1451.

District of Columbia Court of Appeals.

Argued Sept. 19, 1988.
Decided Nov. 17, 1988.

---

Elaine Mittleman, Falls Church, Va., appointed by this court, for appellant King.

G. Godwin Oyewole, Alexandria, Va., appointed by this court, for appellant Manning.

N. Paul Patterson, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell, Helen M. Bollwerk, and G. Paul Howes, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

This is a case which reminds us that conflict between powerful competing human emotions is not unique to persons of great renown, such as the King of England who gave up his throne for love, but also visits with more humble folk. Closing argument was about to begin in what had been, until then, a rather conventional two-defendant jury trial involving the sale of "love" or "loveboat"[1] to an undercover police officer when the proceedings took a dramatic and startling turn. The appellant Darryl A. Manning, who had previously declined to testify, suddenly offered through counsel to waive his privilege

---

1. These are street names for the mixture of phencyclidine (P.C.P.) and marijuana which is, unfortunately, sold with some frequency on the streets of our city. "Ship of doom" would be a more accurate term. *See Thompson v. United States,* 546 A.2d 414, 428 (D.C.1988).

against self-incrimination, admit his own guilt, and testify before the jury, ostensibly to exculpate the woman he evidently loved, the codefendant Angela King. The trial judge, treating this offer primarily as a request by Manning to plead guilty before the jury with respect to which Ms. King had no "standing," denied the motions of both defendants to reopen the case. Concluding that Ms. King had the right, under these circumstances, to call Manning as a defense witness, we reverse her conviction and order a new trial. Manning's arguments for reversal of his own conviction being unpersuasive, we affirm the judgment as to him.

## I

### BACKGROUND

Ms. King and Manning appeal from their convictions of unlawful distribution of P.C. P. and marijuana, in violation of D.C.Code § 33–541(a) (1988). Ms. King claims that the trial judge abused his discretion in denying her pretrial motion to sever defendants and in refusing to allow her to reopen her case after Manning had become available as a witness on her behalf. Manning contends that the trial judge erred in denying his pretrial motions to suppress evidence, identification and statements and that the government failed to prove that he had distributed a "usable amount" of P.C. P.

According to the testimony of the government's witnesses, the sale underlying the convictions followed a pattern all too common on the mean drug-infested streets where many of our fellow citizens have to live. Undercover officers were cruising in an unmarked car when they observed a woman hawking drugs by calling out "boat," a contraction of "loveboat." When the officers stopped their car nearby, the woman and a man approached them. The man opened a plastic vial and handed one of the officers, Deborah Vanadia, a tin foil for her inspection. Officer Vanadia opened it, observed a weed-like substance which looked like marijuana, and detected a strong chemical odor associated with P.C.P. Officer Vanadia then passed $10.00 in pre- recorded funds to the woman to seal the deal.

After the transaction had been completed, the sellers crossed the street. Officer Vanadia immediately broadcast a lookout over the police radio for each of the participants in the apparently unlawful sale. She described the man as a skinny black male, wearing glasses, blue jeans, and a plain long-sleeved shirt which was hanging outside his pants. She described his companion as a heavy set black female wearing a gray sweatshirt-type top and dark colored pants.

Within a minute or so, the arrest team (also known on the street as the "jumpout squad" because of what its members do) arrived on the scene. One of the squad members, Officer Peter Serbinoff, saw no one on the corner, but detected an individual fitting the general description of the male participant in the transaction sitting behind the wheel of a car. The man was beginning to drive away. A woman was seated beside him. The arrest team stopped the vehicle, and Officer Serbinoff directed the driver and his female passenger to alight from the car. The woman was wearing a gray sweatshirt. After the two suspects had stepped out of the vehicle, members of the arrest team detained them and walked them a short distance away. Officer Vanadia "rode by" and identified the detained pair as the two individuals who had sold her unlawful drugs minutes earlier. Both were then placed under arrest, and they turned out to be appellants Angela King and Darryl Manning. The officers found $10.00 in prerecorded funds and a vial which they took from Manning's pocket, but no incriminating evidence on Ms. King.

Following their arrest, appellants allegedly made somewhat inconsistent statements to the police. Manning reported that he had "found" the tin foil and was trying to sell it. Ms. King related, on the other hand, that Manning had purchased the contraband and then sold it.

The appellants were promptly indicted and, as often occurs, they first crossed

swords with the prosecution over a barrage of pretrial motions. Manning moved to sever his case from Ms. King's on the ground that her statement, if admitted, would incriminate him. He withdrew that motion, however, when the government agreed not to use Ms. King's statement unless both defendants testified. Manning also moved to suppress the tangible evidence against him, as well as his inculpatory statement, on the grounds that they were the fruit of an unlawful arrest. Finally, he challenged the police identification of him as unduly suggestive and maintained that the undercover officer had an inadequate opportunity to view him. The trial judge denied each of these motions.

Ms. King also requested that her case be severed from Manning's. She claimed that the evidence was substantially weaker against her than against Manning, because the police had failed to recover any drugs or money from her person. She also contended that, if Manning invoked his privilege against self-incrimination, a joint trial would deny her the opportunity to present his testimony, which, she asserted, would be exculpatory as to her.

The trial judge asked Ms. King's attorney to explain how Manning's testimony would exculpate Ms. King, but counsel was unable or unwilling to make an adequate proffer. Counsel commented that he "had some idea about what the testimony would be," but he expressly declined to disclose it. As a result, the trial judge denied Ms. King's motion to sever and the case proceeded to trial as to both appellants.

At trial, the government's witnesses recounted the events surrounding the arrest, as previously described. A government expert testified, among other things, that the defendants had sold a "usable amount" of P.C.P. and marijuana. In conformity with the government's agreement not to use the defendants' statements unless both defendants testified, the jurors never learned that any statements had been made.

Ms. King was the only witness for the defense. She denied any involvement in or knowledge of the drug sale. She maintained that she was in the area to visit her child's school, and that the police arrested her after Manning, with whom she said she had a "relationship," had picked her up to drive her home. She claimed that an officer had told her that she was going to jail for "love," apparently of the chemical rather than the romantic variety.

After Ms. King completed her testimony, both defendants rested, and the jury was excused. Each defendant then renewed his or her prior motion for judgment of acquittal. The trial judge denied each of these motions, and he and counsel proceeded to discuss jury instructions. Following a short recess, the jury returned to the courtroom for the purpose of hearing closing argument.

It was at this point that what had been an ordinary trial about a killer drug known as "love" became truly extraordinary, for the kind of apparent true love that leads to sacrifice precipitated an unusual denouement. As closing argument was about to begin, Manning's attorney asked to approach the bench. He informed the trial judge that Manning, contrary to the advice of his own attorney, wanted to reopen the case so that he could inculpate himself but exonerate Ms. King. Counsel for Ms. King, the proposed beneficiary of Mr. Manning's sudden generosity, promptly joined in the motion. He urged the court to allow him to reopen his case so that he could call Manning as a witness in Ms. King's behalf. Noting that, besides the police officers, Manning was the only person who was present at the transaction, he maintained that Manning's testimony would be crucial to Ms. King's defense.

Responding to this unexpected development, the prosecutor argued that it was now too late, and incompatible with orderly procedure, for Manning to testify. He also claimed that if the case were reopened and Manning were permitted to testify, he (the prosecutor) would be able to use Ms. King's statement incriminating Manning, since he had reserved that right in the event both defendants testified.

The trial judge, observing that the question whether to allow the defendants to reopen their cases was a discretionary one,

declined to permit them to do so. He told counsel for Manning that

> what you're asking for is an extraordinary reopening in order to plead guilty in front of the jury.

The judge noted that the government had been potentially prejudiced because its witnesses might have left in reliance on all parties having rested. He also expressed concern that if he allowed the testimony to be reopened, Manning would be admitting his guilt but his counsel would be arguing for acquittal, a situation which struck the judge as unseemly.

Addressing counsel for Ms. King, who continued to press his point that he should be allowed to call Manning as his witness, the judge said:

> I don't really think you have standing to insist that he be allowed to reopen his case out of turn. Obviously you would like to have him ... give testimony in behalf of your client.

> \*   \*   \*   \*   \*   \*

> At this point, it's not appropriate. It's an extraordinary reopening and ... it really gives you no change in position from that which you had going in. I'm going to deny that request.

The trial now returned to the ordinary. Counsel made their closing arguments. The judge instructed the jury. The jurors deliberated and convicted both defendants. The judge "stepped back"[2] each of them and eventually sent them to prison for the minimum period permitted by the mandatory minimum statute. *See* § 33–541(c)(1)(b). These appeals followed.

## II

### MS. KING'S APPEAL

A. *The Motion to Sever*

Ms. King contends that the trial judge erred in denying her pretrial motion for severance. We disagree.

▆▆▆ When two or more defendants are charged with jointly committing a criminal

---

**2.** This is courthouse lingo for ordering them detained and directing the marshal to place

offense, there is a strong presumption that they will be tried together. *Jennings v. United States,* 431 A.2d 552, 556 (D.C. 1981), *cert. denied* 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982). The trial judge has wide latitude in determining whether to grant or deny a motion for severance of defendants, and our review is limited to a determination whether his discretion was abused. *Hack v. United States,* 445 A.2d 634, 638 (D.C.1982); *Hamilton v. United States,* 395 A.2d 24, 27 (D.C.1978). Where, as here, the defendant seeking a severance does so because she wishes to call a codefendant as an exculpatory witness, the factors to be considered are

> the exculpatory nature of the desired testimony, the desire of the movant to present his testimony, the willingness of the codefendant to testify, and the demands of judicial administration.

*Jackson v. United States,* 329 A.2d 782, 788 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975). The burden is on the moving party to satisfy the court that the testimony would be exculpatory in effect and that the codefendant is, in fact, likely to testify. *Byrd v. Wainwright,* 428 F.2d 1017, 1020 (5th Cir. 1970). Ms. King failed to carry this burden.

Ms. King claims on appeal that the trial judge should have pressed Manning, *sua sponte,* to determine if his potential testimony would provide grounds for severance. We do not believe that the trial judge had any such obligation. Ms. King's failure to make an adequate proffer could reasonably be viewed as her counsel's tactical decision to avoid revealing the defense case, a decision which the trial judge was bound to respect. Moreover, Manning himself faced serious criminal charges and was represented by an attorney whose function it was to protect his client from incriminating himself. Under these circumstances, it would have been unwise and inappropriate for the trial judge to inject himself into

---

them in the "lock-up" behind the courtroom.

the controversy and seek, *sua sponte*, to question Manning and attempt to elicit his version of the facts. The trial judge therefore exercised his discretion wisely, and Ms. King has made no plausible showing of abuse.

### B. *The Motion to Reopen*

(1) The nature of Ms. King's interest

Ms. King also argues, far more persuasively, that the trial judge abused his discretion [3] when he refused to allow her to reopen her case to permit Manning to testify. We agree.

■ Although Ms. King's contentions on this appeal are not framed in explicitly constitutional terms,[4] the issue presented implicates basic constitutional protections. The Sixth Amendment provides, among other things, that in all criminal prosecutions the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor. The right to call witnesses in one's own behalf is basic to our system of jurisprudence. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). As the Court stated in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Accord, Taylor v. Illinois*, —— U.S. ——, 108 S.Ct. 646, 651–53, 98 L.Ed.2d 798 (1988).

■ Despite its phrasing in terms of compulsory process, the Sixth Amendment embraces not only the right to bring witnesses to the courtroom, but also, in appropriate circumstances, the right to put them on the witness stand. *United States v. Melchor Moreno*, 536 F.2d 1042, 1046 n. 3 (5th Cir.), *reh'g denied*, 543 F.2d 1175 (5th Cir.1976). As the Court observed in *Washington, supra*, 388 U.S. at 23, 87 S.Ct. at 1925,

> the Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use.

■ The right to call witnesses in one's defense is not absolute. *Ronson v. Commissioner of Cor. of State of N.Y.*, 604 F.2d 176, 178 (2d Cir.1979) (*per curiam*). It must, for obvious reasons, give way to the proposed witness' privilege against self-incrimination. *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Moreover, the opportunity to subpoena and present witnesses must be utilized at the appropriate time during the trial, and the Sixth Amendment, in and of itself, cannot be construed to give Ms. King a constitutional right to call a witness once she has rested her case. Nevertheless, the fundamental character of a defendant's right to call witnesses is surely a major factor to be considered in the appropriate balancing process, especially where, as here, Ms. King made the request as soon as Manning was available, *see* pp. 354–355, *infra*, and the government admittedly suffered no appreciable prejudice. Indeed, any interest which the state may have in restricting who may be called as a witness is subject to close scrutiny, *Ronson, supra*, 604 F.2d at 178; *see also Washington, supra*, 388 U.S. at 18–19, 87 S.Ct. at 1922–1923, a proposition which itself recognizes the fundamental nature of the underlying right.

---

**3.** "While it is perhaps superfluous, we nevertheless note that abuse of discretion is a phrase which sounds worse than it really is.... The term does not imply ... any reflection on the judge." *United States v. Walker*, 772 F.2d 1172, 1176 n. 9 (5th Cir.1985).

**4.** Ms. King does, however, hint at constitutional contentions in her quotation from *United States v. Butts*, 630 F.Supp. 1145, 1148–49 (D.Me.1986).

In light of these considerations, we cannot agree with the trial judge's comment that Ms. King lacked standing with respect to the proposed reopening of the case and the presentation of Manning's testimony. Although the motion to reopen originated from Manning's change of mind and heart, Ms. King's stake in the issue was critical, and we are satisfied that she has standing to contest it on this appeal.

### (2) The appropriate standards

■ In general, the decision whether to permit a defendant to reopen her case after the close of the evidence is committed to the sound discretion of the trial judge, and will not be disturbed in the absence of a clear showing of abuse. *See, e.g., Baxter v. United States*, 352 A.2d 383, 386 (D.C. 1976). In *Sellars v. United States*, 401 A.2d 974, 978–79 (D.C.1979), this court held that when the defendant

> seeks to reopen the case on the basis of newly discovered evidence after the defense has rested but before the jury has been charged and begun its deliberations, ... the proper standard should focus on whether a reopening of the case is necessary in the interest of justice.

It is, of course, important to assess the facts of the particular case to determine if the trial court acted appropriately. *Id.* at 980. At bottom, however, the interest of justice standard calls for a new trial if fairness requires that the new witness' testimony should be available to the jury. *Id.* at 979.

Although *Sellars* provides us with some guidance, it does not exactly fit the situation at hand. In *Sellars*, the defendant asked the trial judge for leave to reopen his case after closing argument to present a witness who, so far as can be determined from the opinion, was not previously unavailable, though apparently undiscovered. Ms. King on the other hand, was not attempting to introduce "newly discovered evidence" which may have been previously available but which she had failed to find. Rather, she was seeking to present testimony which she *could not* have introduced earlier in light of Manning's privilege

against self-incrimination. When the trial judge denied Ms. King's severance motion, he effectively, (though properly at that time) precluded her from calling Manning as her witness. This situation changed when Manning suddenly decided to sacrifice his own interest and attempt to exculpate Ms. King. Since Ms. King had both filed a pretrial motion to sever and had acted as swiftly as she possibly could following Manning's change of heart, a less stringent standard might well be applied to her case, especially in the light of the constitutional considerations implicated by the trial judge's refusal to permit her to reopen.

We need not and do not decide that issue, however, because we are satisfied that the trial judge abused his discretion in denying Ms. King's motion to reopen her case under the "interest of justice" standard applied in *Sellars*. We also conclude that this standard is sufficiently flexible to assure a fair result on facts such as those presented here.

In *United States v. Thetford*, 676 F.2d 170, 182 (5th Cir.1982), *cert. denied*, 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983), the court suggested the following factors as a guide in determining whether a motion to reopen the record should be granted:

> In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of granting the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered.

*See also Walker, supra,* 772 F.2d at 1177–82; *United States v. Larson,* 596 F.2d 759, 778 (8th Cir.1979). We now examine Ms.

King's motion in terms of the enumerated factors.

### (a) *The timeliness of Ms. King's motion*

As we have emphasized above, Ms. King asked the court to allow her to reopen her case as soon as Manning announced that he was willing to testify on her behalf. She could not have called Manning to testify earlier, as he could simply have invoked his rights under the Fifth Amendment. Moreover, the request to reopen was made within a very short time after the defense had rested, before any other proceedings had taken place in front of the jury. Whether the consideration of timeliness is viewed in terms of the time which elapsed or in relation to the defendant's diligence, it operates in Ms. King's favor on these particular facts.

### (b) *The character of the testimony*

The testimony which Ms. King proposed to adduce if permitted to reopen her case was that of an eye-witness to the events in question. It can hardly be denied that Manning had personal knowledge of what took place at the time of the transaction and of the role, if any, which Ms. King played in it. His testimony would surely have been "relevant, admissible, technically adequate, and helpful to the jury" in ascertaining Ms. King's guilt or innocence. *Thetford, supra,* 676 F.2d at 182. Moreover, although no detailed proffer was made, Manning's counsel stated on the record that Manning would "implicate himself and exculpate Ms. King with his testimony." It is difficult to conceive of more relevant evidence.

It is true that the state of the record would be more satisfactory if there had been a more detailed proffer. In the context in which the ruling came, however, we are satisfied that we should not treat this consideration as controlling.

It must be remembered that the issue arose from a sudden change of position by Ms. King's codefendant. It is unclear whether, at the time Manning's counsel explained at the bench what his client now wished to do, Ms. King's counsel even knew the details of Manning's proposed testimony as he now proposed to give it. Nobody made any reference to the lack of a proffer. The prosecutor opposed reopening because, in his view, it was too late to reopen, proffer or no. The trial judge did not request a proffer, perceiving the matter as an inappropriate attempt by Manning to plead guilty before the jury in which Ms. King had no cognizable stake. Indeed, probably because he took this view of the issue, the judge ruled after a discussion which was very short indeed.[5]

■ Under these circumstances, we think that the language of the court in *Walker, supra,* 772 F.2d at 1179, applies with equal, if not greater,[6] force here:

> While no formal proffer of the content of Walker's testimony was timely made, and in other circumstances this might count heavily against him, we do not regard it as of any real significance here. Neither the court below nor government counsel even obliquely raised any question in this regard, and indeed it was evident that the government would oppose, and the court would deny, the request to reopen regardless of any proffer concerning the content of Walker's proposed testimony.

Waiver of the right to call a witness in one's defense is not to be inferred lightly, even where counsel has not done all that he could. *See Hackett v. Mulcahy,* 493 F.Supp. 1329, 1336 (D.N.J.1980). We discern no relinquishment of rights here.

Moreover, Ms. King was entitled to call Manning to the stand notwithstanding his apparent vulnerability to cross-examina-

---

5. In fairness to the able trial judge, it is a great deal easier to analyze these questions in hindsight, with the help of briefs, law clerks, and adequate time for reflection, than it was in the late afternoon, with closing argument about to begin, the jury waiting to be called back, and a prohibitive calendar probably awaiting the judge the following day.

6. In *Walker,* the defendant sought to reopen to testify himself; his own testimony had obviously been previously available to him. In the present case, Manning had been unavailable to Ms. King.

tion. *See United States v. Parker,* 136 U.S. App.D.C. 97, 100, 419 F.2d 679, 682 (1969) *(per curiam)* (credibility of testimony of defendant's alleged accomplice for jury to decide). Although a codefendant's readiness to give exculpatory testimony, inconsistent with other credible evidence, has been held insufficient to warrant the granting of a new trial after the defendant's conviction, *United States v. Barlow,* 693 F.2d 954, 966 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed. 2d 1304 (1983), we do not think that *Barlow* or similar authorities will sustain a refusal to permit introduction of a codefendant's testimony, offered during trial and immediately after it became available, on facts such as those presented here.

(c) *The effect of granting the motion*

With commendable candor, the government concedes in its brief that

the request to reopen was not long delayed and it does not appear that the government would have been significantly prejudiced had the court granted the motion.

Unlike cases such as *Sellars,* in which the defendant wished to reopen his case after closing argument, the timing of the request here did not "imbue the evidence with distorted importance." *Thetford, supra,* 676 F.2d at 182.

The government claims that allowing Manning, in effect, to plead guilty before the jury would be inappropriate and prejudicial. *Cf. Reese v. United States,* 467 A.2d 152, 157 n. 6 (D.C.1983) (invocation of privilege against self-incrimination before jury inappropriate). Assuming, *arguendo,* that the government would have been prejudiced by such a procedure, a simple resolution would have been for the trial judge to accept Manning's guilty plea outside the presence of the jury and to permit Manning thereafter to be called as a defense witness for Ms. King. While the trial judge would have had to explain to the jury Manning's sudden absence from the defense table, this would not have presented any significant difficulty. Finally, the extension of the trial by adding a defense witness and possibly a rebuttal witness or two hardly

tilts the balance when Ms. King's opportunity to call a crucial eye-witness in her defense is weighing down the other side of the scale.

(3) Prejudice

In its brief, the government makes an impressive case for the proposition that Manning would have been a vulnerable defense witness, and perhaps a potential feast for an astute cross-examiner:

[G]iven appellant King's testimony, there was no version of events to which Manning could have testified credibly which would have implicated him and exculpated appellant King as defense counsel had suggested he would do. Had he testified that no one accompanied him during the transaction, such a claim necessarily would have been inherently incredible in light of the completely consistent testimony of the government witness that both a man and a woman were involved in the sale and sought by the police. Manning conceivably could have testified that he had been accompanied by a woman who resembled appellant King and wore clothes similar to hers and who left the area of 9th Street and Wahler Place before appellant King emerged from Draper Elementary School and met him on the street. However, such testimony would have surely have been rejected by the jury as too coincidental to be believed. The most credible version of events Manning could have related would have offered the explanation that appellant King had unwittingly accompanied him when he sold the drugs to the undercover officers and that she had taken no part in the sale, having been innocently present. Such evidence, however, would have been directly contradictory to appellant King's assertion that she had not been present during any drug transaction and hence would have severely undercut her defense.

It may well be that the jury would not have believed Manning no matter which version he provided, but the problem is that we will never know. If he had testified that nobody was with him during the sale,

this would indeed have contradicted Officer Vanadia's testimony. The jury, however, might have credited the two defendants over the police account, or might at least have had a reasonable doubt as to the latter. If Manning had testified that Ms. King was with him at the time of the transaction but did not participate in it, this would have contradicted her testimony that she was not present at all. The jury might well have concluded, however, that Manning was telling the truth and that Ms. King was lying to save herself (and perhaps also the man with whom she had a "relationship") but nevertheless did not participate in the distribution of unlawful drugs. It is pointless to speculate what the jurors would have believed if they had heard testimony of which we do not yet know the details and of which the jury heard nothing at all.

We note that the trial judge quite correctly did not rest his decision on any assessment of the veracity or lack thereof of Manning's proposed testimony. As former Chief Justice Burger said for the Court in *Davis v. Alaska*, 415 U.S. 308, 317, 94 S.Ct. 1105, 111, 39 L.Ed.2d 347 (1974), with respect to the trial court's refusal to admit impeachment material as to a prosecution witness:

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony....

We think this reasoning applies, *a fortiori*, to a situation in which the jury had no opportunity to hear from Manning at all. Accordingly, we conclude that Ms. King was substantially prejudiced by the trial judge's denial of her motion to reopen her case, and that she is entitled to a new trial.

### III

### MANNING'S APPEAL

Manning's appeal merits little discussion. He first claims that the trial court erred when it denied his motion to suppress evidence. In particular, he argues that because his lower body was obscured by the dashboard of his vehicle, the arrest team could not have matched him to the broadcast description. He therefore maintains that the police did not have probable cause to arrest him.

Despite Manning's argument to the contrary, we find that, prior to Manning's identification by Officer Vanadia, the stop was not an arrest, but rather a brief detention designed to give the undercover officer an opportunity to advise the arrest team if they had apprehended the perpetrators. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Allen*, 436 A.2d 1303 (D.C.1981). Officer Serbinoff and his colleagues had an articulable basis for their suspicion that Manning and Ms. King were the persons described by Officer Vanadia. Appellants were located shortly after the drug transaction within a short distance of the location where it occurred. The arresting officer saw enough of the defendants' bodies to match them in a general way to the broadcast description. He therefore had the right to direct them to step out of the car—a very minor intrusion indeed—to obtain a better view of them. It was also reasonable, once the appellants were outside the car and the arrest team had recognized that they matched the descriptions provided by Officer Vanadia, to require them to leave the vehicle and walk a short distance away so that the undercover officer could ride by, view them, and determine whether the correct persons had been stopped. *See Muldrow v. United States*, 525 A.2d 1031 (D.C.1987). After appellants had been identified, there was probable cause for their arrest. *Id.* at 1032.

Manning's second claim of error, that the trial court incorrectly denied his motion to suppress the show-up identification as unduly suggestive, is similarly without merit. The undercover officer was a trained police observer who had an adequate opportunity to view Manning during

the drug transaction. Manning was presented to the undercover officer for a show-up identification shortly after the sale took place. Under the circumstances, Manning was not even entitled to an evidentiary hearing. *See In re F.G.*, 534 A.2d 297 (D.C.1987), *pet. for reh'g granted*, 550 A.2d 915 (D.C.1988).

Finally, Manning contends that the trial court improperly denied his motion for judgment of acquittal, because the prosecutor failed to prove that he distributed a "usable amount" of P.C.P. The government's evidence at trial demonstrated that the defendants offered the drugs for sale on the street, folded in the usual tin foil package, and exuding the pungent odor of P.C.P. The chemist's report indicated that the total weight of the substance in the tin foil package was 412.5 milligrams. Of that total, 2.4% was P.C.P. and 97.6% was marijuana. The government's expert testified

that the amount was "usable," an opinion not controverted in any way by either appellant. Under the circumstances, the trial court properly denied Manning's motion for judgment of acquittal and submitted the case to the jury. *See Wishop v. United States*, 531 A.2d 1005 (D.C.1987).

\* \* \* \* \* \*

For the foregoing reasons, we affirm Manning's conviction, reverse Ms. King's conviction, and remand for a new trial as to her.

SO ORDERED.