Christopher L. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CM–480.

District of Columbia Court of Appeals.

Submitted Sept. 26, 2002.

Decided Nov. 7, 2002.

**1218**

Frederick J. Brynn, Washington, DC, was on the brief for appellant.

Dorann E. Banks, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman and Denise Cheung, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and GLICKMAN, Associate Judges.

WAGNER, Chief Judge:

Appellant, Christopher Smith, was convicted following a bench trial of one count of possession of a controlled substance (cocaine) in violation of D.C.Code § 33–541(d) (1998 Repl.).[1] He argues for reversal on the grounds that the evidence was insufficient to convict him and that the trial court erred in declining to permit him to call his former co-defendant as a witness at trial,

---

**1.** This section has been recodified as D.C Code § 48–904.01 (2001).

thereby denying him due process and the right to present a defense. We conclude that the evidence was sufficient to support the conviction; however, we reverse and remand for a new trial because the court erred in precluding appellant from calling his former co-defendant as a witness, and the error was not harmless beyond a reasonable doubt.

## I.

### Factual Background

#### A. Evidence Presented by the Government

Since appellant's initial argument concerns the sufficiency of the evidence to support the charge, we recount in some detail the facts presented at trial. According to the testimony of Investigator Curtis Prince of the Metropolitan Police Department's Fourth District, on December 28, 2000 at about 7:15 p.m., while in an observation post looking for drug activity, he saw several people standing in front of the Serengeti Club in the 6200 block of Georgia Avenue, Northwest. He recognized appellant, who was wearing "a hat, a tan jacket and . . . some dark colored pants or some dark colored jeans." Appellant's jacket was a "parka-style jacket, a heavy coat," according to Investigator Prince. After about fifteen to twenty minutes, a man, later identified as Leroy McNeil, approached appellant and conversed briefly with him. Investigator Prince testified that McNeil walked up to appellant and handed him a small green object that appeared to be currency. Appellant took the money from McNeil and motioned for McNeil to step behind him. Appellant then "reached back towards the right side of his waist and he handed [McNeil] an object from behind." Investigator Prince testified that he could actually see the two

"when their hands came together," but he could not identify exactly what the objects were or their specific color. The investigator testified that he saw McNeil "[take] the object and he apparently had dropped them to the ground because after he retrieved the objects, he bent down and picked up two separate objects from off the ground," and he "looked at them and . . . he walked away." Investigator Prince gave a look-out description for McNeil.

Investigator Jasper Jackson testified that within two minutes of receiving the description, he spotted an individual, later identified as McNeil, who matched it exactly, just one block from the location of the reported transaction. Investigator Jackson, who was a part of an arrest team, stopped McNeil. Investigator Prince had informed members of the arrest team by radio that it was likely that the individual would be carrying the two objects that he had received from appellant in his right hand. When the officers approached McNeil, he dropped two small objects that he had been carrying in his right hand. The police recovered the objects, which were clear, ziplock bags containing a "white rock substance," a portion of which field tested positive for cocaine.[2]

According to Investigator Prince's testimony, after he learned that the arrest team had stopped McNeil and that he possessed a quantity of cocaine, Investigator Prince broadcasted a look-out for appellant and had members of the arrest team come by the observation post to get him. Investigator Prince, along with members of the arrest team, tried to locate appellant at the Serengeti Club, but learned that he had left. While outside the club, they saw appellant walking across Georgia Avenue at Rittenhouse Street, and stopped him in the 900 block of Ritten-

---

2. Other evidence at trial established that the substance was in fact cocaine.

house. Appellant's arrest occurred within 30 minutes and one block of the transaction between appellant and McNeil. In a search incident to appellant's arrest, the officers found $180.00 in cash inside appellant's sock.

## B. Defense Evidence

Appellant's version differed. He testified that at around 6:30 p.m. on the evening of December 28, 2000, he was at the Serengeti Club in the 6200 block of Georgia Avenue. He said that he was wearing a "big white coat, a overcoat, and some blue jeans and some tennis shoes," and that one of his friends, "MTRs Mohammed," was wearing a big tan, parka coat like his, blue jeans and tennis shoes. Appellant described Mohammed as 5'8" or 5'9" tall, with hair and facial hair similar to his own that day. Appellant testified that he was outside of the Serengeti Club for about ten minutes waiting for a ride and that after it came, he went around the corner to the gas station. He testified that he went back to the club, but someone in front of the club told him that he could not go inside because the police were in there. Appellant testified that he then went up the street to purchase a beer from the newsstand and that his companion purchased it for him because his money was in his shoe. After purchasing the beer, he and his friend walked across the street, where he saw a female officer who he thought whispered something to Investigator Prince. According to appellant, Investigator Prince then came over to him, called him by name, and arrested him. Appellant testified that he did not know McNeil before he was arrested and that he did not give McNeil anything or receive any money from him that evening.

Appellant also called Investigator Prince who testified that another individual, later identified as MTRs Mohammed, was stopped that night and was also wearing a tan jacket. Investigator Prince explained that he believed that MTRs Mohammed had been acting "as a lookout" and that is why he stopped him. When asked to compare the appearance of appellant and MTRs Mohammed, Investigator Prince stated "Well, other than the fact that they both had on tan coats, they are two different people."

## C. Appellant's Request to Call Former Co-Defendant as a Witness

At the conclusion of Investigator Prince's testimony, defense counsel stated that he intended to call as a witness appellant's former co-defendant, Leroy McNeil, who had just entered a plea in his case that day. The court remarked that defense counsel had not indicated that McNeil or Investigator Prince would be called by the defense when the court inquired just before the trial commenced.[3] Defense counsel explained that he had not expected McNeil to plead guilty and be available to testify. However, the court observed that McNeil had entered his plea before it inquired of defense counsel about witnesses. The court explained that it had allowed Investigator Prince to be called because he had already testified for the government. The prosecutor interjected that the government had no objection to appellant calling McNeil. Nevertheless, the trial court ruled that it would not permit appellant to call McNeil. The court explained that the testimony that McNeil was expected to give would contradict the factual proffer to which he agreed

---

**3.** Prior to the commencement of the bench trial, the court asked defense counsel whether there were any defense witnesses to which he responded, "Your Honor, at this point, possi-bly defendant Christopher Smith." The court then asked if there were any witnesses in the courtroom and stated that any witnesses should leave the courtroom.

earlier and possibly constitute perjury. The court also mentioned that McNeil had been in the courtroom for most of the government's case. Defense counsel stated, "With that ruling, Your Honor, the defense would rest."

### D. The Verdict

In finding appellant guilty of possession of cocaine, the trial court credited the testimony of Investigators Jackson and Prince. It explained further that

> given the fact that they apprehended the suspect in close proximity, two minutes or less, in the time that Investigator Prince observed this hand-to-hand transaction, given the fact that Officer Prince advised Officer Jackson that the suspect should have two small items in his right hand, that two small items were recovered in the suspect's right hand, that is sufficient evidence to connect the two small items to the defendant, Mr. Smith.

### II.

### Discussion

### A. Claim of Evidentiary Insufficiency

Appellant argues that the evidence was insufficient to convict him of possession of cocaine. He contends that absent mere speculation, the evidence was insufficient to prove beyond a reasonable doubt that he possessed the cocaine which was found in McNeil's possession. Specifically, he argues that the investigator did not see him give anything to McNeil and could not identify by shape, size or color, the objects that McNeil dropped while allegedly standing behind him.

■ Our standard of review for claims of evidentiary insufficiency requires that the evidence be viewed in the light most favorable to the government. *See Owens v. United States*, 688 A.2d 399, 402

(D.C.1996)(citing *Blakeney v. United States*, 653 A.2d 365, 369 n. 3 (D.C.1995)) (other citation omitted). In applying that standard, we recognize that it is the province of the trier of fact to determine the credibility of the witnesses and to make reasonable inferences from the evidence presented. *See Gayden v. United States*, 584 A.2d 578, 579 (D.C.1990), *cert. denied*, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991) (quoting *Frendak v. United States*, 408 A.2d 364, 370 (D.C.1979)). "All reasonable inferences must be drawn in favor of the government, and deference must be given to the [trier of fact's] right to determine credibility and weigh evidence." *Owens, supra*, 688 A.2d at 402–03 (citation omitted). We continue to adhere to the proposition that " 'the government is not required to negate every possible inference [of innocence] before an accused may be found guilty of an offense beyond a reasonable doubt.' " *Id.* at 407 (quoting *In re T.J.W.*, 294 A.2d 174, 176 (D.C.1972)) (citing *Banks v. United States*, 287 A.2d 85, 87 (D.C.1972)). " 'It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction.' " *Zanders v. United States*, 678 A.2d 556, 563 (D.C.1996) (citing *Gayden*, 584 A.2d at 580 (quoting *Frendak, supra*, 408 A.2d at 371)).

■ To prove the offense charged in this case, possession of a controlled substance, the government is required to prove beyond a reasonable doubt that the accused: (1) possessed a controlled substance (cocaine); and (2) that he did so knowingly and intentionally. *See* D.C.Code § 33–541(d); *Criminal Jury Instructions for the District of Columbia*, No. 4.28 (4th ed.1993). Proof of possession requires that the government establish that the accused had actual or constructive

possession of the prohibited item. *See Bernard v. United States*, 575 A.2d 1191, 1195 (D.C.1990); *see also Criminal Jury Instructions for the District of Columbia*, No. 3.08 (4th ed.1993). In this case, the government's theory was that appellant had actual possession of the cocaine before giving it to McNeil, who dropped it as the police approached him. "Actual possession has been defined as the ability of a person to knowingly exercise direct physical custody or control over the property in question." *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.), *cert denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981). The question is whether the evidence, viewed most favorably to the government, supports this theory.

 "Proof of possession can be established by either direct or circumstantial evidence." *Hubbard, supra*, 429 A.2d at 1338 (citing *United States v. Bethea*, 143 U.S.App. D.C. 68, 71, 442 F.2d 790, 793 (1971)). In considering the sufficiency of the evidence, we make no distinction between direct and circumstantial evidence, and "[c]ircumstantial evidence is not intrinsically inferior to direct evidence." *Bernard, supra*, 575 A.2d at 1193 (citations omitted). Viewing the evidence in the light most favorable to the government, as we must, the evidence, both direct and circumstantial, was sufficient to support the charge. *See Owens, supra*, 688 A.2d at 402. There was evidence that Investigator Prince observed appellant and McNeil making an exchange of money for two small objects in a somewhat surreptitious manner. The investigator saw McNeil drop the objects, pick them up, examine them, and walk away with the items in his right hand, which he reported immediately to Investigator Jackson. Within two minutes, Investigator Jackson saw appellant, just one block away, walking in the same direction as reported, and McNeil was still holding two packets in his right hand, which he dropped as Investigator Jackson approached. The two objects turned out to be ziplock bags of crack cocaine. Crediting the testimony of the two investigators, the trial court inferred from this evidence that the two items which McNeil had were items which he obtained from appellant when they made the hand-to-hand exchange. Given what the investigators observed, the trier of fact could infer reasonably that the two items that McNeil had in his right hand just two minutes after receiving two small items from appellant were the same items, particularly given the surrounding evidence of the furtive exchange and the timeline. It is the factfinder's prerogative to determine credibility and to make reasonable inferences from the facts which have been proven. *See Stack v. United States*, 519 A.2d 147, 159–60 (D.C.1986) (citing *Boyd v. United States*, 473 A.2d 828, 832 (D.C.1984)) (other citations omitted). As appellant points out, each piece of evidence in isolation may not be sufficient to support a conviction. However, the evidence must be viewed as a whole, and the chain of facts and circumstances and the reasonable inferences to be drawn therefrom are sufficient to support the verdict.

### B. Denial of Right to Call Defense Witness

Appellant argues for reversal on the grounds that the trial court violated his Fifth and Sixth Amendment rights by precluding him from calling as a witness his former co-defendant, McNeil. He contends that McNeil's testimony was central to his defense in that McNeil was in the best position to testify about whether he obtained the crack cocaine from him. He argues that the remaining evidence was weak on the issue, since Investigator Prince did not see the item that McNeil received from appellant and could not de-

scribe the objects McNeil dropped by shape, size or color, and the $180 recovered from him came from his sock.

■ The accused in a criminal trial has a right to call witnesses on his own behalf. *Howard v. United States,* 656 A.2d 1106, 1117 (D.C.1995) (citing *Washington v. Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)) (other citation omitted). This right, which is fundamental to our system of justice, is one protected by the due process clause of the Fifth Amendment and the Sixth Amendment right to present witnesses to establish a defense, which includes the right to compulsory process to secure their presence. *Id.* (citations omitted). This right is not absolute, and the exclusion of evidence is generally a matter of trial court discretion. *Id.* (citing *Johns v. United States,* 434 A.2d 463, 473 (D.C.1981)); *King v. United States,* 550 A.2d 348, 353 (D.C.1988) (citing *Ronson v. Comm'r of Corr. of State of N.Y.,* 604 F.2d 176, 178 (2d. Cir.1979)). For example, the right, "must, for obvious reasons, give way to the proposed witness' privilege against self-incrimination." *Id.* (citing *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). The failure to assert the right timely may result in the loss of an opportunity to call a witness. *See id.* However, the waiver of this right is not to be inferred lightly. *See id.* at 355. (citation omitted). Thus, when exercising its discretion in determining whether to preclude a defense witness' testimony, the trial court must weigh such considerations " 'against the constitutional rights of a defendant to present a defense.' " *Howard,* 656 A.2d at 1117 (quoting *Clark v. United States,* 639 A.2d 76, 81 (D.C.1993) (citing *Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986)).

■ In reviewing a decision by the trial court denying a defendant the right to call a witness, the first inquiry is whether the error amounts to the violation of a constitutional right. *Howard, supra,* 656 A.2d at 1117–18. If a constitutional error has occurred, reversal is required "unless the government shows it was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." *Id.* This means that

> Where ... the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to cross examine a witness or present evidence concerning bias or a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt, applying the test set forth in *Chapman,* 386 U.S. [at 24, 87 S.Ct. 824].

*Howard,* 656 A.2d at 1118 (quoting *Clark, supra,* 639 A.2d at 81). If a non-constitutional error has occurred, it is subject to "reversal under *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)" which sets forth a less stringent test for harmless error than *Chapman. Id.*

In this case, the trial court precluded appellant from calling his former co-defendant, McNeil. McNeil entered a plea of guilty on the day of trial. During the plea proceeding, he agreed to the government's factual proffer, which included that he obtained the drugs from the appellant. When the trial court inquired whether there was any part of the statement with which he did not agree, McNeil responded, "No, I guess." The court pressed him further, asking, whether he "accept[ed] those facts as true facts in your case," and McNeil responded "yes." When defense counsel indicated during the presentation of appellant's case that he intended to call McNeil as a witness, the court responded that he had failed to identify McNeil as a defense witness earlier. Defense counsel

reminded the court that the witness had just become available after the plea. The trial court ruled that McNeil would not be permitted to testify, with the explanation that

> [d]efendant McNeil entered a guilty plea. He pled guilty to a specific factual proffer and that factual proffer would be the testimony that he's expected or the question[s] he's expected to be asked and the testimony he's expected to give would be completely contradictory to the factual proffer that he accepted as true in his case and would, in my view, possibly constitute perjured testimony and I'm not going to allow it. In addition, he sa[t] in this courtroom during most of the Government's case.

Thus, the three factors guiding the court's decision were: (1) the timing of the request; (2) the violation of the rule on witnesses; and (3) the prior statement of the proffered witness would be inconsistent with any exculpatory evidence that McNeil could provide. The question is whether these factors are sufficient to weigh against appellant's right to call his former co-defendant in his defense.

■ The first factor considered by the trial court, the timing of the request, is not one which would weigh against appellant in this case. McNeil did not become available as a witness until the day of trial. Until that time, he could have invoked his Fifth Amendment privilege against self-incrimination. *See King, supra,* 550 A.2d at 355. Moreover, the defense had not rested its case when McNeil was called, and the government did not object. In *King,* a case similar to this one, defendant King had rested and requested to reopen her case to call her co-defendant after he announced that he was willing to testify on her behalf, but the trial court precluded it. *Id.* Under these circumstances, we found that the timing of the request operated in King's

favor in the analysis used to determine whether King was denied her right to present a crucial eye-witness. *Id.* Similarly, in this case, appellant made a request to call McNeil just a short time after he became available, and before he rested his case. Here also, the timing factor weighs in appellant's favor.

■ The second factor relied upon by the trial court was a violation of the rule on witnesses. Excluding witnesses from the courtroom during the presentation of testimony or precluding them from discussing their testimony with other witnesses prevents improper attempts to influence or tailor the testimony to that of the other witnesses. *See Benn v. United States,* 801 A.2d 132, 141 (D.C.2002); *Brown v. United States,* 388 A.2d 451, 456 (D.C.1978) (citations omitted). Since the purpose of this procedure can be served by less severe remedies, violation of the sequestration order alone will not justify exclusion of the witness. *Id.* (citing *Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893)). "Generally, the violation of the court order must be so egregious that it 'has somehow so discredited the witness as to render his testimony incredible as a matter of law.'" *Id.* (citing *Taylor v. United States,* 388 F.2d 786, 788 (9th Cir.1967)). In this jurisdiction, we have held that "a witness' testimony will be excluded *only* where the violation of the court order 'was with the connivance or knowledge of the party and his counsel.'" *Id.* (quoting *Jett v. Jett,* 221 A.2d 925, 927 (D.C.1966)) (other citations omitted)(emphasis in the original). The record fails to show the type of egregious violation of the order which would warrant the exclusion of the witness. When the trial court inquired whether any witnesses were present and asked any witnesses to leave, it does not appear that McNeil knew at that time that he would be called. The record reflects no effort to ascertain whether ap-

pellant or his counsel advised, counseled or otherwise brought about a violation of the court's order. It is not clear how long or during which portions of the testimony McNeil was present in the courtroom. The court indicated only that the witness was there for most of the government's case. The government had no objection, and therefore, likely anticipated no prejudice. Given these circumstances, this factor alone was insufficient to overcome appellant's right to call a witness in his own defense.

■ The final factor relied upon by the trial court for its decision precluding the witness from testifying is the prior statement he gave which is inconsistent with appellant's innocence. This court has held that a defendant has a right to call a witness in his defense "notwithstanding his apparent vulnerability to cross-examination." *King, supra,* 550 A.2d at 355–56 (citing *United States v. Parker,* 136 U.S.App. D.C. 97, 100, 419 F.2d 679, 682 (1969)). A prior inconsistent statement is insufficient to preclude the introduction of a co-defendant's testimony when it becomes available. *Id.* The prior statement could be used to impeach McNeil if inconsistent with his testimony at trial. Although taken in open court, the statement was not under oath, as his testimony would have been. It was for the factfinder, in this case the court, to assess the witness' credibility based upon his testimony at trial and any impeaching evidence. The factfinder might have believed the trial testimony instead of the blanket assent to the overall proffer, rather than each detail. Instead, without hearing McNeil's testimony, the court determined that it would be incredible in light of his admission at the plea proceeding. This anticipatory assessment of credibility was not a sufficient basis for precluding appellant from calling in his defense the one person who knew for certain from whom he received the drugs.[4] Since all three factors relied upon by the trial court in its decision precluding the witness from testifying weigh in favor of allowing the testimony, we can only conclude that the trial court erred in precluding appellant from calling McNeil as a witness in his defense.

■ The government argues that the trial court's preclusion of McNeil's testimony, if error, did not affect appellant's substantial rights and was, therefore, harmless under the standard set forth in *Kotteakos, supra,* 328 U.S. at 757–65, 66 S.Ct. 1239 (error is harmless if we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"). However, where "the trial court's evidentiary ruling wholly deprive[s] the defendant of any opportunity ... to present evidence," harmlessness is determined applying the *Chapman* standard, *i.e.* harmless beyond a reasonable doubt. *Clark, supra,* 639 A.2d at 81 (citing *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824). Here, the trial court's ruling deprived appellant of any opportunity to call the defense witness. Thus, the *Chapman* stan-

---

4. The trial court did not seek, and there was no clear proffer about what McNeil's testimony would be. In *King, supra,* there was no clear proffer of what the co-defendant would say if he had been permitted to be called as a witness for the defendant, and this court concluded that it was not a controlling consideration. 550 A.2d at 355. There, as in this case, the trial court did not seek a proffer, and no one referenced the lack of a proffer before the court denied the request to call the co-defendant. *See id.* Similarly, in this case, although it would be helpful to have such a proffer, we do not view it as controlling to a resolution of the issue. *See id.* Moreover, in foreclosing the testimony of the witness, the trial court assumed that it would be exculpatory. Therefore, appellant had little incentive to make a proffer. He preserved his claim of error.

dard applies. Applying that standard, we conclude that the error was not harmless beyond a reasonable doubt. McNeil was an eyewitness-participant in a criminal offense for which appellant was convicted. He was the only person who could refute the police officer's testimony that appellant gave him drugs.

The government argues in support of its harmless error argument that it called two other witnesses to testify concerning appellant's misidentification defense and that the court, having heard from McNeil during his plea hearing, could evaluate his proposed testimony. First, only one witness called by the government testified that it was appellant, rather than someone else, who made an exchange with McNeil from whom drugs were recovered later. While identification was an issue at trial, also in issue was whether the drugs recovered from McNeil were the same objects that appellant gave to McNeil. Other evidence bearing on this issue was not substantial. Second, as previously stated, knowledge that a proposed witness has made a prior inconsistent statement is not grounds for excluding his testimony at trial. *King, supra,* 550 A.2d at 355–56 (citation omitted). The appellant had a right to call witnesses on his own behalf, here, the only witness who could provide exculpatory testimony on his behalf. Third, the evidence involved a central issue. Under these circumstances, we cannot say that the erroneous exclusion of McNeil as a witness was harmless beyond a reasonable doubt.

For the foregoing reasons, the judgment appealed from hereby is reversed, and the case is remanded to the trial court for a new trial.

*Reversed and Remanded.*