**Faouly DAVIS and Marvin A. Sanders, Jr., Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 97–CF–567, 97–CF–761.**

District of Columbia Court of Appeals.

Submitted and Argued May 4, 1999.

Decided Aug. 12, 1999.

Kenneth H. Rosenau, Washington, DC, appointed by the court, filed a brief for appellant Faouly Davis.

John E. Carpenter, appointed by the court, for appellant Marvin Sanders.

Sarah T. Chasson, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Mary Patrice Brown, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and RUIZ, Associate Judges.

SCHWELB, Associate Judge.

This is a case in which an apparent dispute over turf between two groups of very young men had fatal consequences, ending one life and ruining two more. On February 12, 1997, a jury found Marvin A. Sanders, Jr. guilty of first-degree murder while armed[1] and related weapons offenses[2] in connection with the shooting death on June 30, 1995 of Nathaniel Brown. Faouly Davis was found not guilty of first-degree murder, but he was convicted of the lesser included offense of second-degree murder. Both defendants filed timely appeals on various grounds. We affirm.

## I.

### THE EVIDENCE PRESENTED AT TRIAL

The government's theory at trial was that Brown was murdered as a result of animosities between certain residents of Florida Park, where Sanders and Davis

---

1. D.C.Code §§ 22–2401, –3202 (1996).

2. Possession of a firearm while committing a crime of violence, § 22–3204(b), and carrying a pistol without a license, § 22–3204(a).

lived, and young men from Sursum Corda, which was Brown's neighborhood. These animosities apparently grew out of rivalries between high school cliques. Sanders and Davis, both of them still in their late teens, evidently did not like guys from Sursum Corda "hanging around" Florida Park. In spite of his residence in Sursum Corda, Brown had friends in the rival neighborhood. To visit these friends, Brown would have to intrude upon the defendants' turf. It was just such an intrusion that is alleged to have led to Brown's death at the age of eighteen.

David Kinard was a key witness for the government. Kinard testified that on June 30, 1995, Nathaniel Brown rode his bicycle into a park located near the corner of Florida Avenue and First Street in northwest Washington, D.C. Upon arrival, Brown was surrounded by a group of five or six young men, including both of the defendants. According to Kinard, the men boxed Brown in from all sides, inhibiting his movements. Davis stood behind the rear wheel of Brown's bicycle and helped to prevent Brown from escaping in that direction. According to Kinard, Sanders then shot Brown six times in cold blood. Upon completing his deadly task, Sanders immediately ran off further into the park. Kinard testified that Davis remained on the scene and stood over Brown's body, gloating and uttering "little slurs," e.g., "[w]e carry big shit up here. Don't come up here with that bullshit."

Kinard, a recent graduate of a Salvation Army drug treatment program, admitted on cross-examination that he had been stabbed and seriously wounded by Sanders a few years earlier, and that his evidence against Sanders had provided him with an "opportunity" for revenge.[3] Kinard was also confronted with his grand jury testimony, which differed in some respects from his evidence at trial with respect to where he was standing when the shooting occurred and as to his ability to observe the events that he was describing. Kinard acknowledged that he did not contact the police immediately after the murder to reveal the identity of the killer. Further, Kinard was impeached with several prior convictions, and he testified that he had agreed to cooperate with the prosecutors in this case in the hope that he would receive some assistance from them with respect to charges then pending against him in Virginia.[4]

Kinard's identification of Sanders as the shooter was corroborated in some measure by several other witnesses. Annette Terry, a woman who lived nearby, testified that after hearing shots ring out in the park, she had seen a person whom she believed to be Sanders run past her home; Ms. Terry did not, however, witness the shooting.[5] Alvin Tapp, an elderly man who admitted that he was consuming alcohol at the time, claimed that he was sitting in the park, four feet from the location of the shooting, and that he saw Sanders fire at Brown; Tapp, too, was heavily impeached.[6] Danny Duncan placed both Davis and Sanders in the park on the evening of June 30, 1995, and he identified Sanders as the shooter, but Duncan's cred-

---

**3.** Kinard testified that "God granted that opportunity and I'm here to do what I got to do."

**4.** The indictment in Virginia had been dismissed by the time Kinard testified against Davis and Sanders at the trial. Kinard claimed that the dismissal of the Virginia charges was unrelated to the present case.

**5.** Unlike Kinard, Ms. Terry testified that the man she observed was wearing a mask.

**6.** Although Tapp claimed to have been sitting in the park for an hour before the shooting occurred, he did not observe anyone ride up on a bicycle, nor did he see any men surround a young man on a bike. Tapp was unable to describe the shooter to the police at the scene, and he failed, two months later, to select Sanders' photograph from a photo array displayed to him by the police. Tapp identified Sanders at trial after he had seen Sanders sitting at the defense table in the courtroom earlier in the proceedings.

ibility came under heavy defense fire.[7]

There was also purported "motive" testimony against both defendants. Duncan claimed that approximately a month and a half before the shooting, he and Davis and other Florida Park residents were shooting dice in a parking lot when Brown came on the scene. According to Duncan, Davis was displeased by Brown's intrusion and remarked that "if we [got] caught in their neighborhood we wouldn't get out alive." Mitchell Johnson testified that, earlier in the summer, Sanders had instructed him to "tell them niggers down there that it's whatever and stuff like that." Johnson testified that he understood this perplexing phrase as a coded threat against the residents of Sursum Corda.

Neither defendant took the witness stand. Davis did not present a defense. Corley King, an intern at the Public Defender Service, was the principal witness for Sanders. According to Ms. King, Kinard informed her during an interview that he was testifying against Sanders because Sanders had stabbed him a year earlier and because this was "an easy way to get back at him." Kinard also allegedly told Ms. King that he did not intend to testify in this case until the prosecutors "cleared up" his charges in Virginia. A police firearms examiner called by Sanders acknowledged that investigating officers had not recovered the murder weapon.

## II.

### SANDERS' MOTION TO REOPEN HIS DEFENSE

Of the numerous claims presented by the defendants on this appeal, the only question that merits plenary discussion is whether the trial judge abused his discretion by denying Sanders' motion to reopen his case after the attorneys had presented their closing arguments and after the judge had instructed the jury. At this belated stage of the trial, Sanders' counsel sought for the first time to call an additional defense witness, and Sanders now claims that the judge abused his discretion by denying this request. In order to place this issue in its proper context, we must set forth in some detail the unusual series of events that led to the defense motion.

### A. The trial court proceedings.

On Thursday, February 5, 1997, the second day of the trial, Kinard testified that his friend Linda Hawkins was with him near the intersection of First Street and Florida Avenue when he saw Sanders shoot Nathaniel Brown in the park. On February 10, 1997, Sanders' attorney informed the court that she had attempted to subpoena Ms. Hawkins, but that Ms. Hawkins had refused to come to court. According to counsel's proffer, Ms. Hawkins was expected to testify that she was not with Kinard at the location described by Kinard at the time the shooting occurred. At counsel's request, the judge issued a bench warrant and gave Sanders' attorney until the following morning, February 11, to produce Ms. Hawkins as a witness. The judge declined to give the defense additional time because "[t]he defense had the entire weekend to try to subpoena this witness or talk to the witness" and had unduly delayed its attempt to secure her presence.

Ms. Hawkins was not at the courthouse when trial resumed on February 11. The testimony having been completed, the

---

7. Duncan, a convicted drug dealer and an admitted addict, had become a paid informant for the Drug Enforcement Agency. The defense claimed that Duncan first identified Sanders as the shooter approximately eight months after the murder, at a time when Duncan was seeking sentencing concessions from the government. Duncan asserted that he told the police on the day of the murder that Sanders was the gunman, but the investigating detectives had no information that Duncan had made any such statement shortly after the shooting, and the parties so stipulated.

Duncan was the only government witness, other than David Kinard, who placed Davis at the scene. Duncan did not testify, however, that Davis participated in Brown's murder.

judge declined to delay the case any further, and counsel presented their closing arguments. While Davis' attorney was at the podium, however, Ms. Hawkins arrived in the hallway outside the courtroom. Notwithstanding her arrival, the defense made no request to the court regarding Ms. Hawkins until the prosecutor had completed his rebuttal argument. At that time, Sanders' attorney requested only that the judge "admonish Ms. Hawkins at the very least" for her allegedly contemptuous earlier conduct in failing to comply with the subpoena. Even at that point, counsel did not ask for leave to reopen her case. Finally, after the jury had been instructed, counsel orally moved to reopen Sanders' defense, and she requested the judge to allow Ms. Hawkins to testify.[8] The judge denied the request, but emphasized that he would give careful consideration to any post-trial motion that might be based on Ms. Hawkins' expected testimony. See p. 474, *infra*. The defendants were convicted as described above. No post-trial motion was filed by either defendant. These appeals followed.

### B. *The legal standard.*

Sanders claims that the trial judge's ruling deprived him of his constitutional right to call witnesses in his own defense. "The Sixth Amendment provides, among other things, that in all criminal prosecutions the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor." *King v. United States,* 550 A.2d 348, 353 (D.C. 1988). "Despite its phrasing in terms of compulsory process, the Sixth Amendment embraces not only the right to bring witnesses to the courtroom, but also, in appropriate circumstances, the right to put them on the witness stand." *Id.* (citation omitted). This right, however, is not absolute. *Id.* (citing *Ronson v. Commissioner of Correction of State of N.Y.,* 604 F.2d 176, 178 (2d Cir.1979) (per curiam)).

Rather, "the opportunity to subpoena and present witnesses must be utilized at the appropriate time during the trial, and the Sixth Amendment, in and of itself, cannot be construed to give [Sanders] a constitutional right to call a witness once [he] has rested [his] case." *Id.*

"In general, the decision whether to permit a defendant to reopen [his] case after the close of the evidence is committed to the sound discretion of the trial judge, and will not be disturbed in the absence of a clear showing of abuse." *Id.* at 354 (citation omitted). "Among the factors which the court should consider in exercising its discretion are (1) the timeliness of the motion, (2) the nature of the evidence, including its relevance, and (3) prejudice to the opposing party." *Diaz v. United States,* 716 A.2d 173, 182 (D.C. 1998) (citing *King, supra,* 550 A.2d at 354). "The belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." *King, supra,* 550 A.2d at 354 (quoting *United States v. Thetford,* 676 F.2d 170, 182 (5th Cir.1982), *cert. denied,* 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983)).

In addition to considering the prejudice to the opposing party if the motion to reopen is granted, the court must also weigh the prejudice to the moving party if the motion is denied. *See King, supra,* 550 A.2d at 356. Where, as here, potentially exculpatory evidence is at issue, a sensitive balancing of the various interests is called for. Applying these factors to the facts at hand, and especially in light of the trial judge's readiness to consider any explicitly proffered exculpatory evidence in a post-trial motion, we conclude that the judge did not abuse his discretion when he denied Sanders' motion to reopen his case.

---

**8.** Although Kinard was the only witness who claimed that Davis had participated in the murder, counsel for Davis did not join in Sanders' belated motion.

### (1) *The timeliness of the motion.*

Sanders' request to reopen his case came at an extraordinarily late stage of the trial. The testimony had long been completed. Closing arguments had been made. The trial judge had completed his charge to the jury. Had the judge granted Sanders' motion, the disruption of the trial would have been substantial and arguably irreparable. The highlighting of the new evidence, at the expense of the old, would have been more or less inevitable so late in the proceedings, and "the reopening of the record would have had a particularly disruptive effect on the orderly flow of the trial." *Sellars v. United States,* 401 A.2d 974, 980 (D.C.1979).

Moreover, the lateness of the request to reopen was not unavoidable. The reader will recall that Kinard disclosed the existence of Ms. Hawkins as a possible witness on February 5, 1997. The trial judge was not apprised of Sanders' intent to call Ms. Hawkins to testify, however, until five days later. The record thus amply supports the judge's finding that the defense waited five days, which included a weekend, before asking the judge to take steps to assure the witness' presence.

Counsel for Sanders could arguably have asked the court to allow him to reopen his case as soon as Ms. Hawkins appeared at the courthouse.[9] Instead, it was not until the conclusion of the government's rebuttal argument that counsel notified the court that Ms. Hawkins had arrived, and at that time she asked only for an admonition to the witness. The judge thus quite reasonably found that, by unduly delaying first, the request for a subpoena, and second, the motion to reopen the defense, Sanders' attorney significantly contributed to a situation in which reopening the case would have disrupted the orderly course of the proceedings and in which the motion therefore became increasingly difficult for the court to grant.

### (2) *The nature of the evidence.*

There is no gainsaying that Ms. Hawkins' evidence, as proffered by Sanders' attorney, was potentially probative and significant. If Ms. Hawkins had testified to everything that counsel hoped that she would say, then she would have directly contradicted the testimony of the one prosecution witness who implicated both defendants in Brown's murder. Kinard testified that at the time he witnessed the shooting of Nathaniel Brown, he (Kinard) was near the park in the company of Ms. Hawkins. Sanders' attorney proffered, however, that Ms. Hawkins would testify to the contrary:

> Ms. Hawkins will say that she was not on the scene, she was in a house on Florida Avenue at the time that this happened.... [S]he did not want to get into specific details about where Kinard was.... He may have been with her .... My understanding is that she will say that she was not out there talking to him at any time during the relevant period that afternoon.

If Ms. Hawkins had testified in conformity with the foregoing proffer, and if the jury had believed her account, then this would have been a potentially serious blow to the prosecution. Without Kinard's evidence, the government's case was problematic. The testimony of the other prosecution witnesses who identified Sanders as the shooter, while not necessarily incredible, was beset with difficulties. See notes 6 and 7, *supra.* The prosecution's proof of motive, *e.g.,* "it's whatever and stuff like that," was ambiguous at best. Credible evidence to the effect that Kinard was not where he said he was, and with whom he said he was, when Brown was killed would have struck at the heart of the testimony of the one witness whom the jury probably had to believe in order to convict the defendants.

9. We recognize, however, that an attorney who is making a closing argument in an armed first-degree murder case may find it difficult to focus immediately on other matters.

The government describes Ms. Hawkins' expected account as "cumulative impeachment testimony" and seeks to minimize its significance. We do not believe that the government's characterization of the defense proffer is an accurate one. Kinard's credibility had previously been attacked by the defense on the grounds, among others, that Kinard had a grudge against Sanders, that he was a drug user, and that he had been seeking the assistance of the District of Columbia prosecutors with the resolution of charges pending against him in Virginia. But unlike the foregoing evidence, which tends only to impeach Kinard's general credibility, Ms. Hawkins' testimony, as proffered, would have contradicted Kinard's account *of this particular shooting*, and it might have raised a doubt as to whether Kinard observed the event at all.[10] The government's claim that Ms. Hawkins' evidence would have been cumulative appears to rest on a tacit assumption that Kinard's credibility had already been undermined, and that testimony directly contrary to his account of the murder, even if true, could not have weakened it further in any significant measure. We find this contention singularly unpersuasive.

### (3) *Prejudice.*

If the judge had granted Sanders' belated motion to reopen his defense, there would have been substantial potential for prejudice to the government and, in a wider sense, to the administration of justice. Although prejudice to the administration of justice may also result if relevant and potentially material evidence is withheld from the jury, it is important that such evidence be presented at a time and in a manner that does not impair the jury's ability to evaluate fairly all of the evidence presented. The jury, as we have noted, had already heard closing arguments, as well as the judge's charge. Common sense would surely have told any reasonably intelligent juror that, if the case was going to be reopened at this stage of the proceeding, then there must have been some very unusual intervening development which the judge viewed as significant enough to warrant a departure from normal trial practice. If the judge had permitted Ms. Hawkins to testify, doing so would surely have "imbued [her] evidence with distorted importance ...." *King, supra,* 550 A.2d at 354 (citation omitted). An appropriate jury instruction could, of course, have been fashioned, but the judge might well apprehend under these circumstances that a direction to the jurors to treat this extraordinary reopening of the case as if it were a routine event, and Ms. Hawkins' testimony as no more important than that of other witnesses, would be no easier to heed than an instruction not to think about a pink elephant.

Moreover, the problem would not have ended there. If Ms. Hawkins had testified in conformity with her proffer, counsel for the prosecution would surely have interviewed and cross-examined her. The government would also have sought to investigate any new information and to ascertain the existence of any witnesses who could verify or contradict Ms. Hawkins' account. A continuance might well have been requested, and the possibility of rebuttal testimony would have loomed large. If the jury had subsequently received the case after more delay, more testimony, more argument, and more instructions, the resulting departure from orderly procedure could cast doubt upon the reliability of the ultimate verdict. At the very least, the trial judge might reasonably apprehend that public confidence in that verdict would

---

10. In this sense, Ms. Hawkins' evidence cannot fairly be described as mere "impeachment" testimony. Rather, it would have been testimony on the merits. A defense witness who denies that the defendant assaulted the complainant, and who thus challenges the complainant's account, is not thereby converted into an "impeachment" witness. *See generally R. & G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 535–38 (D.C.1991).

be impaired, and that justice would not be perceived to have been done.

### C. *The trial judge's exercise of discretion.*

In denying Sanders' motion to reopen his case, the trial judge stated, in pertinent part:

I know I have discretion to reopen it but I'm not going to do it at this point. I have plenty [of] opportunity to have this [witness] available, and if you file any post-trial motions with respect to the significance of her testimony I will certainly hear from you, but I'm not going to reopen the case at this point.

The judge thus declined to take any action that would disrupt the "orderly flow of the trial," *Sellars, supra,* 401 A.2d at 980, but he clearly and unequivocally communicated to counsel his readiness to consider a post-trial motion based on any relevant testimony that Ms. Hawkins might be prepared to give.

In our view, this constituted a judicious exercise of the court's discretion. We have previously noted the disruptive potential of an order permitting a party to present new testimony after counsel had completed their closing arguments and after the court had instructed the jury. In

declining to permit Sanders to call Ms. Hawkins as a witness "at this point," the judge avoided any danger of prejudice that so belated a reopening of the record might pose to the prosecution or to the administration of justice. At the same time, the judge promised a fair and receptive forum for any relevant information that Ms. Hawkins could provide if Sanders were to file a post-trial motion based on her prospective testimony.[11] Indeed, the post-trial motion route suggested by the judge would potentially have provided Sanders' attorney with more time to interview Ms. Hawkins, to become familiar with her account, and to prepare a more effective presentation, whether in an affidavit or by testimony at the hearing of such a motion.

■ Having been invited to file a post-trial motion,[12] Sanders is in no position to claim that the trial judge declined to allow Ms. Hawkins to be heard on Sanders' behalf. The judge's exercise of discretion must be evaluated in the light of all of the options available to him in the circumstances of this particular case. Here, the judge avoided a substantial danger of prejudice while still inviting the defense to avail itself of an alternative procedural forum to present any exculpatory evidence. There was no abuse of discretion.[13]

---

11. In disposing of any motion for a new trial, the judge would surely have taken into consideration that Sanders had proffered Ms. Hawkins as a witness before the jury returned its verdict.

12. In the trial court, Sanders was represented by able counsel from the Public Defender Service.

13. In denying Sanders' motion, the trial judge also stated that the jury had "ample evidence to assess [Kinard's] testimonial credibility," and that "[h]is drug addiction, any additional collateral impeachment on the issue is not going to be material to the resolution of the fact ... questions in this case." To the extent that the judge may have been of the opinion that Ms. Hawkins' proffered testimony was merely collateral impeachment of limited probative value, we are constrained to disagree. See discussion at pp. 473–74, *supra.* Given the judge's stated readiness to consider Ms. Hawkins' evidence if it was presented in a

post-trial motion, however, our disagreement with the judge's apparent view of Ms. Hawkins' evidence as "collateral impeachment" does not require reversal of Sanders' conviction.

Sanders also contends that in exercising his discretion, the trial judge failed to consider all of the factors enumerated in *King, supra,* namely, timeliness of the motion, the nature and relevance of the evidence, and prejudice. We think that the judge expressed himself, at least implicitly with respect to the first two of these considerations, and arguably as to the third as well. The lateness of the motion was obvious; so too was the potential for prejudice to the government and to the administration of justice. In any event, "[t]he judge's failure, during the necessarily hurried proceedings, to make explicit mention of [these] considerations does not, in our view, preclude us from adverting to them on appeal." *Salmon v. United States,* 719 A.2d 949, 954 n. 10 (D.C.1997).

## III.

## CONCLUSION

We have examined Sanders' re-

Because the case against Davis consisted almost exclusively of Kinard's testimony, Davis could have benefitted substantially from any evidence from Ms. Hawkins that would have further undermined Kinard's credibility. Nevertheless, Davis did not join Sanders' motion to reopen the defense case, nor has he raised, as an issue on appeal, the denial of that motion. "Because we have concluded that [Sanders'] rights were not violated, we need not decide whether a successful claim of reversible error by [Sanders] would have inured to [Davis'] benefit ...." *Peyton v. United States,* 709 A.2d 65, 74 n. 21 (D.C.) (citations omitted), *cert. denied,* —— U.S. ——, 119 S.Ct. 134, 142 L.Ed.2d 108 (1998). We likewise need not determine the standard of review that would have applied if Davis, having failed to join Sanders' motion to reopen in the trial court, had nevertheless raised the denial of that motion on appeal as a ground for reversal.

14. Sanders claims that the evidence was insufficient, as a matter of law, to support his conviction for first-degree murder. Viewing the record in the light most favorable to the prosecution, however, the jury could fairly find, beyond a reasonable doubt, that the murder of Nathaniel Brown was committed intentionally and with premeditation and deliberation. *See, e.g., Ruffin v. United States,* 642 A.2d 1288, 1291 (D.C.1994) (premeditation and deliberation may be formed in "a few seconds"); *Mills v. United States,* 599 A.2d 775, 780–83 (D.C.1991) (relevance of motive evidence and of transportation of murder weapon).

Sanders also contends that the trial judge erred by permitting Tapp to make an in-court identification of Sanders when Tapp had failed to identify Sanders in a pretrial photo array. Prior to making his courtroom identification, Tapp had observed Sanders in the courtroom and had recognized him as the shooter. There was no evidence that the government orchestrated Tapp's observation of Sanders in the courtroom, and we conclude that the reliability of Tapp's identification of Sanders was properly left to the jury; admissibility must be distinguished from sufficiency, and the latter issue is for the jury. *See, e.g., United States v. Hunter,* 692 A.2d 1370, 1376–77 (D.C.1997); *Middleton v. United States,* 401 A.2d 109, 131–34 (D.C.1979). We also disagree with Sanders' contention that the prosecution violated the strictures of *Brady v.. Maryland,* 373 U.S. 83, 83 S.Ct. 1194,

maining contentions and conclude that none warrants reversal of his convictions.[14] Davis' contentions are likewise without merit.[15]

10 L.Ed.2d 215 (1963) by failing to disclose Tapp's failure to make an identification from the photo array, for a failure to identify (as opposed to a misidentification) is not exculpatory. *See Johnson v. United States,* 544 A.2d 270, 275 (D.C.1988).

15. Contrary to Davis' contention on appeal, the evidence against him, though hardly overwhelming, was sufficient to establish his guilt of murder in the second degree as an aider and abettor. *See, e.g., Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983) (per curiam) ("[p]roof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty participation in the crime as an aider and abettor"). Assuming, without deciding, that Davis has preserved for appeal his claim that the judge should not have instructed the jury as to second-degree murder, we conclude that the instruction was proper. *See, e.g., Bragdon v. United States,* 668 A.2d 403, 405 (D.C.1995).

Davis also complains of the court's jury instruction that "[i]t is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed, or that he has intended to commit the particular crime committed by the principal offender." According to Davis, this instruction is appropriate only in felony murder cases.

During a discussion between court and counsel of the judge's proposed instructions, Davis' attorney objected to the quoted language on the ground now pressed by Davis on appeal. Subsequently, however, the judge redrafted his proposed instruction on aiding and abetting to "cover the concerns we talked about," and counsel for Davis then stated: "That's fine, that's fine." Under these circumstances, Davis is precluded from assigning this instruction as error. *See* Super. Ct. Crim. R. 30. In any event, the charge as a whole was not "plainly wrong." *See, e.g., Graham v. United States,* 703 A.2d 825, 832 & n. 10 (D.C.1997); *United States v. Walker,* 321 U.S.App. D.C. 300, 303–04, 99 F.3d 439, 442–43 (1996) ("perfectly matched" intent not required). Moreover, Davis was not convicted of first-degree murder, and the instruction of which he complains did not prejudice him.

Finally, Davis contends that the trial judge should have excluded, as prejudicial "other crimes" evidence, testimony regarding Sand-

Accordingly, the convictions are

*Affirmed.*

---

ers' alleged threatening message to the Sursum Corda faction ("whatever and stuff like that"), as well as Davis' alleged complaint, during Brown's visit to a parking lot in Florida Park, that "if we got caught in their neighborhood we wouldn't get out alive." Even if we were to assume that this testimony could fairly be considered "other crimes" evidence—a dubious assumption—we perceive no error. Although the probative value of some of the challenged testimony, and particularly of Mitchell Johnson's rendition of Sanders' comment, was less than overwhelm-ing, the evidence was relevant to the defendants' motive. The trial judge could reasonably conclude that the probative value of the evidence was not substantially outweighed by its prejudicial effect, and we perceive no abuse of the judge's discretion. *See Johnson v. United States,* 683 A.2d 1087, 1094–95, 1098–1100 (D.C.1996) (en banc), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). In addition, Johnson's testimony focused on Sanders, not Davis, and any derivative prejudice to Davis was therefore attenuated.