*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CF-0187

EDDIE AUSTIN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-CF3-011203)

(Hon. Judith A. Smith, Trial Judge)

(Submitted Sept. 27, 2022              Decided April 20, 2023)

*Mindy Daniels* was on the brief for appellant.

*Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Jeffrey Wojcik*, *Pravallika Palacharla*, and *Emmanuel C. Hampton*, Assistant United States Attorneys, were on the brief for appellee.

Before DEAHL and HOWARD, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

---

[*] Judge Glickman was an Associate Judge of the court at the time of submission. He began his service as a Senior Judge on December 21, 2022.

DEAHL, *Associate Judge*:  Eddie Austin appeals his convictions for carjacking and related offenses after he drove off in his friend Ashley Thomas's car.  Thomas was holding onto the car's door when Austin started driving away, and she was dragged behind the car for some time, causing her various injuries, before she let go. On appeal, Austin advances five different arguments, two of which we preview now.

First, Austin argues that his convictions for unauthorized use of a vehicle and first-degree theft of a vehicle should merge.  Our precedents once directed that very result, but they did so under a fact-based approach to merger that we have since rejected, and in any event there have since been material statutory amendments to D.C. Code § 22-3203 that compel a different result.  Those amendments instruct that "[a] person may be convicted of any combination of theft, . . . unauthorized use of a vehicle," and a variety of other offenses "for the same act or course of conduct," making clear that the offenses do not merge, so that our precedents once holding otherwise have been superseded by statute.  We therefore reject Austin's argument that these offenses merge.

Second, Austin argues that the government presented insufficient evidence to convict him of assault with significant bodily injury, which we have defined as injury requiring medical treatment necessary "to prevent long-term physical damage,

possible disability, disfigurement, or severe pain," or similar maladies. *In re R.S.*, 6 A.3d 854, 859 (D.C. 2010); *see* D.C. Code § 22-404(a)(2). The government presented evidence that Thomas had suffered scarring on a large portion of her back, which was still visible to the jury at trial a year later. We conclude that this suffices to show significant bodily injury.

We therefore affirm the majority of Austin's convictions, though we remand and direct the trial court to vacate one of his convictions (as it merges with another) and resentence Austin (because it sentenced him for assault with intent to rob while armed, where the jury convicted him only of the unarmed version of that offense).

## I.

### A.

Eddie Austin and Ashley Thomas were friends. They had known each other for many years and would hang out regularly. Thomas would sometimes ask Austin to "do [] little stuff for [her]," like paying for her to get her hair and nails done, or to get her brakes fixed. On the day in question, Thomas picked Austin up in her car and drove to the beauty supply store, where Thomas testified that Austin "was supposed to buy [her] some hair." But after the pair exited the car, they got into a

heated argument and Thomas told Austin not to get back into her car, though he did so anyway.  Thomas then drove somewhere in order to buy marijuana, all the while asking Austin to leave.  After Thomas picked up the marijuana, she drove toward her cousin's house.  As they were driving along the highway, Thomas heard Austin on the phone telling somebody, "I'm about to steal this bitch."  Thomas understood that to be slang for Austin saying he was about to punch her.

Thomas pulled over onto the median and got out of the car but, as she was getting out, she remembered that she had left her keys in the ignition.  She tried to get back into the car through the driver's door, but Austin had started climbing from the passenger seat into the driver's seat and pushed her out.  Austin then started to drive off, though Thomas managed to hold on to the driver's side door handle.  Thomas clung to the door as Austin drove down the highway, with cars rushing past her.  She eventually let go, rolled over onto the median, got up, and stumbled to the side of the highway.

Three woman were driving by at the time and saw the events unfold.  They all stopped and spoke to Thomas, and one of them called 9-1-1.  An ambulance arrived and the paramedics treated Thomas on the side of the road.  Thomas had scrapes on her arms, wrists, and knee, and had lost a decent-sized patch of skin on a portion of

her lower back, leaving a raw spot on her back about the size of a paper plate. The ambulance then drove Thomas to hospital, where she was prescribed pain medication for her injuries. Thomas's car was later found about half a mile from Austin's residence.

**B.**

Austin was charged with seven counts: carjacking, D.C. Code § 22-2803(a); assault with intent to commit robbery, D.C. Code § 22-401; assault with significant bodily injury while armed, D.C. Code §§ 22-404(a)(2), -4502; assault with a dangerous weapon (motor vehicle), D.C. Code § 22-402; first-degree theft, D.C. Code §§ 22-3211, -3212(a); unauthorized use of a vehicle, D.C. Code § 22-3215; and threats to do bodily harm, D.C. Code § 22-407.

Austin's defense was mistaken identification. Thomas identified Austin as the driver at trial and she had identified him with "a hundred percent certain[ty]" in a photo array before trial. But Thomas was the only witness to identify Austin, and Austin posited some reasons to doubt the reliability of her identification. Thomas had testified that she had memory issues linked to a previous car accident that had left her in a coma for two months, and she also smoked marijuana regularly, including before testifying in court. There were inconsistencies between Thomas's

testimony and those of other witnesses, including that one witness heard Thomas say, directly after the incident, that she did not know the driver. There were also internal inconsistencies in Thomas's testimony, including the length of time she had known Austin and the extent to which Austin would pay for things like her rent. To bolster his theory of mistaken identity, Austin put on an alibi defense, claiming that he was at home at the time of the incident with his mother and girlfriend, both of whom testified to that effect.

Three aspects of the record are particularly relevant to this appeal: the first relates to the government's evidence of Thomas's injuries, the second to a snippet of Thomas's testimony, and the third to Austin's alibi witnesses.

### 1. Thomas's Injuries

In support of its assault with significant bodily injury charge, the government established the following facts at trial about Thomas's injuries. Thomas had scrapes on her arms, wrists, and knee, and had lost the skin on a portion of her lower back. As she was being treated by the paramedics, she was breathing heavily and kept repeating "it hurts, it hurts." She testified at trial that it felt like her injuries were "just burning and burning and burning." At the hospital, she was prescribed pain medication for her injuries, but the doctors subsequently had to change her

medication because her pain was continuing to get worse over time. The government introduced photographic and video evidence of what Thomas's back looked like in the hours after the incident, and one witness fairly described a large portion of her lower back as looking "pink," as if "her skin was off."

The government also introduced photos of Thomas's back taken several weeks after the incident, which showed significant discoloration of the portion of her lower back where she had lost the skin. The police officer who took the photos testified that her back injury "looked like severe road rash and almost like a burn mark." At trial, almost a year later, Thomas showed her back to the jury, and the government offered without refutation that the jury could still see the mark on her lower back.

### 2. Thomas's Testimony About "Other Crimes" Evidence

Before Thomas's testimony, the government previewed that she would testify that Austin tried to steal hair from the beauty supply store, which is why she was angry at him and did not want him in her car. Austin objected to the testimony on the ground that it was "other crimes" evidence that should be excluded. The trial court agreed with Austin and instructed both the government and Thomas that she

could describe a general disagreement between her and Austin while in the beauty supply store, but she was not to testify to the substance of the disagreement.

On cross-examination, however, Thomas contravened the trial court's direction. Defense counsel was asking Thomas about a different argument she had with Austin about getting her brakes fixed, when the following exchange occurred:

> Q. [T]hrough text messages didn't you argue about the fact that he was not getting your brakes fixed?
>
> A. See—see I don't know how to answer that question. Because when you say argue about not getting my brakes fix, when—when we argued about him not getting my brakes fixed, it's because he—I took him to the store and he went in there and started stealing. Oh, my goodness gracious.

The judge interrupted Thomas and sent the jurors out of the room. Defense counsel moved for a mistrial, and while the judge denied that request, she asked for defense counsel's input as to how a curative instruction should be phrased. The judge reinstructed Thomas that she must answer only the questions she was asked, and specifically that she was "not permitted to testify about any prior incidents of theft or other crimes that [Austin] may have committed, other than the incident that occurred on the highway." When the jury returned, the judge told them, using defense counsel's requested language, that "the last comment by Ms. Thomas is

stricken[] and not to be considered by the jury." The judge repeated a version of this instruction in its final jury instructions, without objection.

### 3. *Austin's Jail Calls to His Alibi Witnesses*

Austin presented an alibi defense at trial. He called two witnesses, his mother and girlfriend, who testified that he had been home with them the night of the incident. To discredit this theory, the government argued that Austin had asked these witnesses to testify on his behalf, insinuating that they were fabricating their testimony. The government played phone calls that Austin had made to them from jail. In these calls, Austin asked them both to come to court and testify that he was with them the night of the incident. The government played the calls during cross-examination of Austin's mother and girlfriend, and both witnesses testified that they recognized their own voice, and Austin's voice, in the recordings. During its closing argument, the government played the call between Austin and his girlfriend and urged the jury to listen to the call between Austin and his mother during deliberations. Defense counsel also urged the jury in closing to "[l]isten to the phone calls," though he maintained that the calls were mere pleas from a falsely accused in the hopes that his mother and girlfriend would simply tell the truth. It appears,

however, that the actual recordings of those jail calls were not formally admitted into evidence before the jury was sent to deliberate.

During deliberations, the jury sent a note requesting the audio of these phone calls. Austin's counsel objected to sending the recordings back to the jury after realizing they had not formally been admitted into evidence. The court overruled the objection. It reasoned that the calls had already been played to the jury during cross-examination, so it was permissible and non-prejudicial to permit the government to formally admit the recordings into evidence even though the jury had begun its deliberations. The court decided it could either call the jury back and reopen the evidence in order for the recordings to be admitted, or it could reopen the evidence and admit them outside the presence of the jury. Austin continued to object to the recordings' admission but asked that, if they were admitted, they be admitted outside the presence of the jury so as not to draw attention to them. The court thus admitted the recordings and sent them back to the jury.

\*\*\*

The jury found Austin guilty on all counts. The court sentenced Austin to a total of ten years of imprisonment followed by five years of supervised release. Austin now appeals his convictions.

## II.

On appeal, Austin makes five arguments: (1) several of his convictions merge, (2) the government did not provide sufficient evidence to prove assault with significant bodily injury, (3) the trial court should have granted his request for a mistrial when Thomas testified, contrary to the court's directions, that he stole from the beauty supply store, (4) the judge abused her discretion in letting the jury hear the recordings of the jail phone calls during their deliberations, and (5) he was erroneously sentenced for assault with intent to rob (AWIR) while armed despite only being convicted of unarmed AWIR.  We consider each argument in turn.

## A.

Austin first argues that several of his convictions merge with others.  We review merger issues de novo.  *Nero v. United States*, 73 A.3d 153, 159 (D.C. 2013).  The most interesting of the merger issues concerns whether unauthorized use of a vehicle (UUV) and first-degree theft merge, as we have previously held.  We agree with the government that recent statutory amendments, post-dating our precedents holding that these offenses merge, make clear that the convictions do not merge.  We otherwise generally reject Austin's merger arguments save for one.  We agree, as the government concedes, that his assault with a deadly weapon (ADW) conviction

merges with his assault with significant bodily injury (ASBI) while armed conviction.

"[O]ur merger inquiry consists of two steps. We first apply *Blockburger* and ask whether each offense requires proof of an element the other does not, and then ask whether there was a clear legislative intent sufficient to override the presumptive answer yielded in step one." *Grogan v. United States*, 271 A.3d 196, 204 (D.C. 2022) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). Under the first step, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. "[T]he proper question is whether each offense contains distinct statutory elements, not whether the same evidentiary fact was used to prove an element of more than one offense." *Grogan*, 271 A.3d at 204 (quoting *Hanna v. United States*, 666 A.2d 845, 853 (D.C. 1995)). If each offense contains distinct statutory elements, they are presumed to be independent; if not, they are presumed to merge. *See id.* Under the second step, we ask whether "the legislature has clearly indicated a contrary intent with respect to the particular offense at issue," in which case "that legislative intent—rather than the *Blockburger* analysis—controls." *Id.* (quoting *In re M.S.*, 171 A.3d 155, 158 (D.C. 2017)). This

is because the "require[ment] that [multiple] convictions 'merge' for the purposes of sentencing" comes from the Double Jeopardy Clause, and "the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Id.* at 203 (citations omitted).

This court has previously held that UUV and first-degree theft merge. *See Arnold v. United States*, 467 A.2d 136, 139 (D.C. 1983); *Galberth v. United States*, 590 A.2d 990, 991 n.1 (D.C. 1991) (citing cases holding the same). But we later rejected *Arnold*'s "fact-based" approach to merger, when sitting en banc, as irreconcilable with Supreme Court precedents. *See Byrd v. United States*, 598 A.2d 386, 390 (1991) (en banc). And it appears that each of this court's holdings that UUV and first-degree theft merge predates *Byrd* and adhered to *Arnold*'s mistaken fact-based analysis, so that they have been substantially undermined by the en banc court's analysis in that case. *See Lee v. United States*, 668 A.2d 822, 828 (D.C. 1995) (we are not "oblige[d] . . . to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined . . . by our own supervening rulings en banc").

Conducting afresh the *Blockburger* analysis based solely on the elements of UUV and first-degree theft, we conclude that these offenses do not presumptively

merge after all: first-degree theft requires proof that the item wrongfully obtained be worth $1,000 or more, D.C. Code § 22-3212, whereas UUV does not; and UUV requires that the item commandeered be a motor vehicle, D.C. Code § 22-3215, whereas first-degree theft does not.  Notably, the government does not make any argument that *Arnold* and *Galberth* were substantially undermined by this court's en banc opinion in *Byrd*, nor do the parties before us conduct any *Blockburger* analysis of the elements of these offenses.  We nonetheless exercise our discretion to address this component of the merger analysis, and conclude that the offenses do not presumptively merge under *Blockburger*.

Even if they did presumptively merge under *Blockburger*, any such presumption would be rebutted under step two of our merger analysis, which reveals that the D.C. Council did not intend for UUV and first-degree theft to merge.  In 2009, after every decision holding that UUV and first-degree theft merged, D.C. Code § 22-3203(a) was revised to include the affirmative proposition that a person "may be convicted" of both theft and UUV.  That provision now reads, in full:

> A person may be convicted of any combination of theft, identity theft, fraud, credit card fraud, unauthorized use of a vehicle, commercial piracy, and receiving stolen property for the same act or course of conduct; provided, that no person shall be consecutively sentenced for any such combination or combinations that arise from the same act or course of conduct.

The Council's intent is clear from this language, and we hold that UUV and first-degree theft do not merge.[1]

Austin makes a host of additional merger arguments. First, he argues that his convictions for ADW and ASBI while armed merge, and the government concedes the point because ADW is a lesser-included offense of ASBI while armed. *See White v. United States*, 207 A.3d 580, 592 (D.C. 2019). Austin's ADW conviction must therefore be vacated.

None of Austin's remaining convictions merge, however. Austin is mistaken to contend that his AWIR conviction merges with either his first-degree theft or his UUV convictions. AWIR requires proof of assault, D.C. Code § 22-401, while first-

---

[1] *Byrd* makes clear that even the earlier version of this statute—in effect when we decided *Arnold* and *Galberth*—also indicated that the two offenses do not merge. That earlier iteration of this provision stated that "[n]o person shall be consecutively sentenced for both: (a) theft and fraud; (b) theft and unauthorized use of a vehicle; or (c) theft and commercial piracy; for the same act or course of conduct." D.C. Code § 22-3803 (1981). In *Byrd*, we explained that "the Council's intent is clear" that "[w]hat is prohibited by § 22-3803 is not dual convictions or concurrent sentences, but, specifically, that a defendant not be 'consecutively sentenced.'" 598 A.2d at 394. Neither *Arnold* nor *Galberth* considered this provision, in effect at the time of those decisions, in their merger analyses. *See Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) ("The rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." (citation omitted)). Even if they had, our later en banc opinion in *Byrd* would control over any conflicting opinion of a division.

degree theft and UUV do not. Conversely, first-degree theft requires proof that the defendant "obtain[ed] or use[d] the property of another," D.C. Code § 22–3211(b), while AWIR does not. And UUV requires proof that the defendant "t[ook], use[d], or operate[d] a motor vehicle," D.C. Code § 22–3215, while AWIR does not. Austin also argues for the first time in his reply brief that his convictions for UUV and carjacking merge. We have previously rejected that argument. *See Allen v. United States*, 697 A.2d 1, 2 (D.C. 1997) ("Carjacking obviously contains elements which UUV does not, most notably the use of force or violence," while UUV requires that the defendant "took, used, operated or removed the vehicle," whereas carjacking might be committed by merely forcibly removing the vehicle's owner and then burning the vehicle on the spot). Austin does not acknowledge *Allen*'s holding or point to any material statutory amendments that would give us license to revisit its holding.

**B.**

Austin next argues that the government did not present sufficient evidence that Thomas suffered significant bodily injury, as is required for an ASBI conviction. When considering the sufficiency of the evidence, we ask whether the government's evidence was "strong enough that a jury behaving rationally really could find it

persuasive beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc). Our review is deferential, giving "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (citation omitted). We consider the evidence "in the light most favorable to" the prevailing party, the government in this case, "drawing all reasonable inferences in the government's favor." *Dorsey v. United States*, 154 A.3d 106, 112 (D.C. 2017) (citation omitted).

A "significant bodily injury" as defined in § 22-404(a)(2) is "an injury that requires hospitalization or immediate medical attention." We have had frequent occasions to elaborate on that statutory standard, beginning with *In re R.S.*, where we noted that "the threshold for significant bodily injury is markedly less severe than [the serious bodily injury] required for aggravated assault." 6 A.3d at 859. We directed attention to "the nature of the injury itself and the practical need in the ordinary course of events for prompt medical attention"—meaning that an injury could "require[]" medical attention even if no such attention is sought. *Id.* And we defined "medical attention" as treatment that is "necessary to preserve the health and wellbeing of the individual, *e.g.*, to prevent long-term physical damage, possible disability, disfigurement, or severe pain." *Id.* (citation omitted). Considering the

facts of *In re R.S.*, "where the injury to the [victim's] ear required four to six stitches and left a scar and where treatment was sought and administered with reasonable promptness, we ha[d] no difficulty in sustaining the trial court's conclusion" that the injury was significant. *Id.*

In *Quintanilla v. United States*, we explored in greater depth "what kind of injury requires 'hospitalization or immediate medical attention.'" 62 A.3d 1261, 1264 (D.C. 2013). We emphasized that not just any injury that one happened to receive medical treatment for qualified as significant: "everyday remedies such as ice packs, bandages, and self-administered over-the-counter medications, are not sufficiently 'medical' to qualify under the statute," but rather "[t]reatment of a higher order, requiring true 'medical' expertise, is required." *Id.* at 1265. We decided that an injury "requires" medical attention if it is necessary "to abating pain that is 'severe'" or if the victim would "suffer additional harm by failing to receive professional diagnosis and treatment." *Id.* at 1264. But we also noted that "immediate medical 'attention' in the form of monitoring or even testing" can be said to be "required" even "where no 'treatment' is ultimately necessary to preserve or improve the victim's health," as in the case of "a head injury that may or may not have resulted in a concussion." *Id.* at 1264 n.18. We determined that the injuries in that case were not significant where the victim had swelling in her face and fingers,

received cold compresses in an ambulance but no medical treatment, and had "no long-term effects" other than "a week and a half" of headaches, "swollen fingers for about three weeks, and two months of an almost unusable index finger." *Id.* at 1265.

In short, our precedents instruct that to "require . . . immediate medical attention" under § 22-404(a)(2), "medical attention must be aimed at one of two ends—preventing long-term physical damage and other potentially permanent injuries or abating pain that is severe instead of lesser, short-term hurts," *Teneyck v. United States*, 112 A.3d 906, 909 (D.C. 2015) (citations omitted).

In this case, Austin argues that the government presented insufficient evidence to show that Thomas had suffered significant bodily injury because none of her injuries were "of a higher order," requiring medical attention. The government counters that it presented sufficient evidence of significant bodily injury under two distinct theories: (1) that treatment was necessary to help prevent long-term physical damage, in the form of scarring on Thomas's back, and (2) that medical intervention was also necessary to abate Thomas's severe pain. Because we believe the considerable scarring on Thomas's back sufficed to show significant bodily injury, we do not reach the issue of whether the government also showed medical attention was necessary to prevent severe pain.

The government presented evidence that Thomas suffered long-term scarring on her back as a result of being dragged along the highway beside her car. The government showed the jury photos of Thomas's back, taken several weeks after the incident, which showed substantial discoloration over a significant portion of her back. The police officer who took those photos testified that, at that time, the mark on her back "looked like severe road rash and almost like a burn mark." At trial, almost a year later, Thomas showed her back to the jury, and the government described (without objection or refutation) that the jury could still see her injuries. The government then argued in closing—also without objection or refutation—that the jury could see a mark still on her back from where they were sitting in the jury box.

Austin does not dispute that Thomas suffered "some scarring" along her back. He argues only that this scarring did not constitute "significant disfigurement." But that is not the applicable legal standard. It is *serious* bodily injury, under the aggravated assault statute, that requires "protracted and obvious disfigurement." *In re R.S.*, 6 A.3d at 859 n.4 (quoting *Nixon v. United States*, 730 A.2d 145, 150 (D.C. 1999)). Here we are dealing with *significant* bodily injury, which can be satisfied by showing the complainant suffered "disfigurement" or "long-term physical damage." *See id.* at 859. Perhaps de minimis scarring would not count as

disfigurement or long-term physical damage in the relevant sense, but the evidence the government presented here did not show a de minimis scar. Thomas lost the skin on a significant portion of her lower back, and that mark was large enough that it was apparently visible to the jury box from the witness stand almost a year later.

The seemingly permanent—or at least protracted and "potentially permanent," *Teneyck*, 112 A.3d at 909—nature of Thomas's scarring distinguishes this case from injuries in other cases that Austin relies upon. In *Teneyck*, for instance, there was no evidence that the shards of glass in the complainant's hands caused him to suffer any "protracted injury." *Id.* at 911. And in *Quintanilla*, the complainant suffered "no long-term effects" beyond, at the longest, two months of difficulty using her index finger. 62 A.3d at 1265. Similarly, in *Wilson v. United States*, there was no evidence that the cuts and bruises to the victim's face, though graphic, would leave any protracted or permanent marks. 140 A.3d 1212, 1218 (D.C. 2016). Thomas, by contrast, suffered the type of "long-term physical damage" or "other potentially permanent injur[y]" that we have said suffices under the statute. *Teneyck*, 112 A.3d at 909. Thomas's level of injury is at least on par with the injuries to the complainant in *In re R.S.* In that case, lacerations to the victim's ear "left scars visible seven months later." 6 A.3d at 855. Though the victim's injuries in that case

required stitches, *id.*, while Thomas's injuries did not, Thomas still appeared to have a large scar almost a year later.

Finally, while our precedents have sometimes opined that an injury is not significant if "the victim would not suffer additional harm by failing to receive professional diagnosis and treatment," *Quintanilla*, 62 A.3d at 1265, that statement is somewhat imprecise. When a complainant in fact suffers "long-term physical damage" such as "disability" or "disfigurement" despite medical treatment, § 22-404(a)(2) does not require a showing that medical intervention did or could have staved off additional harm. Long-term physical damage can itself be said to require "immediate medical attention" even when that attention is destined to be ineffectual.[2] To read our precedents otherwise would render the infliction of more serious permanent injuries—those that cannot be mitigated, rare though they might be—as less culpable than the infliction of less serious injuries that can, through medical intervention, be abated. That would be an absurd result that neither the statutory language nor our precedents dictate. *See Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) (asking whether the "judicial mind has been applied to and

---

[2] This would otherwise be a harder case, because there was no evidence that the scarring on Thomas's back could have been prevented (or even mitigated) by medical treatment, though perhaps a jury could draw that inference without evidence to that effect.

passed upon the precise question" in assessing precedential weight (citation omitted)).

Viewing the evidence in the light most favorable to the government, there was sufficient evidence for a reasonable jury to conclude that Thomas had suffered significant bodily injury.

**C.**

Austin next argues that the trial court erred when it did not grant a mistrial after Thomas testified, contrary to the court's instruction, that Austin stole from the beauty supply store. We review the decision to deny a mistrial for abuse of discretion. *See Tann v. United States*, 127 A.3d 400, 475 (D.C. 2015). We conclude that the trial court did not abuse its discretion here.

Evidence that a defendant has committed another crime is generally inadmissible "unless that evidence can be admitted for some substantial, legitimate purpose." *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964). This is because of the high risk that a jury will improperly infer, from the fact that a defendant has committed other crimes, that he has a criminal disposition and is therefore more likely to be guilty of the charged offenses. *Id.* at 89-90. The government does not

contest on appeal that the trial court properly excluded evidence that Austin stole from the beauty supply store. It instead argues only that Thomas's contravention of that ruling did not warrant a mistrial.

"This court will not overturn the trial court's decision [to deny a mistrial motion] unless it appears unreasonable, irrational, or unfair, or unless the situation is so extreme that the failure to reverse would result in a miscarriage of justice." *Tann*, 127 A.3d at 475 (quoting *Lee v. United States*, 562 A.2d 1202, 1204 (D.C. 1989)). A mistrial "is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Id.* at 476 (citation omitted). "Whenever possible, the court should seek to avoid a mistrial by appropriate corrective action which will minimize potential prejudice," *Goins v. United States*, 617 A.2d 956, 958-59 (D.C. 1992), for instance, by issuing limiting instructions, *see Coleman v. United States*, 779 A.2d 297, 302 (D.C. 2001). "In assessing the potential prejudice to [a defendant], we look to . . . 'the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court.'" *Id.* (quoting *Bennett v. United States*, 597 A.2d 24, 27 (D.C. 1991)). All four factors weigh against finding prejudice here.

First, Thomas's fleeting testimony was not particularly potent. Thomas made only one brief statement before immediately stopping herself. *See McRoy v. United States*, 106 A.3d 1051, 1061 (D.C. 2015) (no abuse of discretion where witness's slip "was brief and non-specific"). The statement was not closely related to the crimes with which Austin was charged. *Dorman v. United States*, 491 A.2d 455, 458 (D.C. 1984) (en banc) ("[The] danger that the jury will draw the impermissible inference from the defendant's past convictions that he is guilty of the current offense . . . is especially great if the past crimes are similar to the current offense."). By contrast, in *Rainville v. State*, a case that Austin relies on, the witness's outburst strongly implied that the defendant, who was on trial for sex offenses against the witness's eight-year-old daughter, had previously committed sex offenses against her nine-year-old son. 614 A.2d 949, 953 (Md. 1992). Thomas's testimony also did not suggest that Austin had engaged in any crime more serious than petty theft or shoplifting, both misdemeanors. D.C. Code § 22-3212(b) (second-degree theft punishable by "imprisonment for not more than 180 days"); D.C. Code § 22-3213(b) (shoplifting punishable by "not more than 90 days" of imprisonment). That alleged conduct did not resemble, nor was it likely to infect the jury's assessment of, the far more serious carjacking, assault with a dangerous weapon, and assault with significant bodily injury charges that Austin faced.

Second, the government had a strong case. The core facts were not in dispute: several witnesses had seen Thomas being pushed out of a car and then dragged behind it down the highway. Austin's only defense was that he was not the person who did those things, but that was a tough sell given that Thomas had known Austin for many years and had been driving around together for the whole day before the incident. Thomas identified Austin immediately with what she considered to be one hundred percent certainty in a photo array, and Thomas's vehicle was later found about half-a-mile from Austin's residence. While Austin did present two alibi witnesses—his mother and girlfriend—their relationships with Austin gave them an obvious bias in favor of supporting his defense.

Third, Thomas's statement did not affect a central issue in the case. Whether or not Austin had committed theft from a store did not affect the defense theory of whether Thomas had misidentified him. *See Goins*, 617 A.2d at 960 ("The central issues in this case were identification and alibi. We do not regard the single reference to appellant's unspecified criminal record to be central to those issues.").

Fourth, the judge took appropriate mitigating actions. The judge stopped Thomas immediately after her outburst and sent the jury out of the courtroom, and then complied with each of the defense's requests short of granting a mistrial. The

judge adopted the defense's preferred instruction striking the testimony and cautioning jurors not to consider it, referring simply to the witness's "last comment" rather than repeating what that statement was. *See id.* at 958-59 (no abuse of discretion where trial court, among other things, "consulted with counsel before fashioning a remedy" and "followed [the witness's misstatement] immediately with a cautionary instruction").

In light of those factors, we conclude that the judge acted within her discretion in declining to grant a mistrial.

**D.**

Austin also argues that the judge abused her discretion in belatedly admitting audio recordings of Austin's jail phone calls with his mother and girlfriend after the jury had retired to deliberate. We disagree.

The decision to allow a party to reopen a case to admit evidence "is a question within the trial court's sound discretion, and its decision will not be disturbed unless the court is shown to have abused its discretion." *Shelton v. United States*, 983 A.2d 979, 987 (D.C. 2009) (quoting *Davis v. United States*, 735 A.2d 467, 472 (D.C. 1999)). "In determining whether the court abused its discretion in" permitting a

party to reopen the record, "this court considers, among other factors (1) the timeliness of the motion, (2) the nature of the evidence, including its relevance, and (3) prejudice to the opposing party." *Id.* (quoting *Davis*, 735 A.2d at 472).[3]

All three factors support the judge's decision to admit the recordings that had already been played for the jury during the presentation of evidence.[4] The government's motion to admit the recordings was made as soon as the parties and the court realized that the evidence had not been admitted. The evidence was relevant to assessing the credibility of Austin's alibi witnesses; indeed, Austin had not objected to the government using the recordings to cross-examine his alibi witnesses. And the introduction of the recordings did not prejudice Austin. The recordings had already been played to the jury during the trial, and both sides had

---

[3] Austin asks us to apply a more rigorous standard that pertains to cases where the trial court allows unadmitted evidence to be considered by the jury. *See, e.g.*, *Vaughn v. United States*, 367 A.2d 1291, 1296 (D.C. 1977) (discussing "cases where an item of evidence not admitted at trial is transmitted to the jury room"). But that line of cases is inapposite here. This was not a case of unadmitted evidence making its way before the jury, but of evidence that had been properly put before the jury but was only belatedly—after deliberations began—formally admitted.

[4] The government does not offer, and so we do not consider, any argument that playing the recordings for the jury without objection might amount to effectively admitting the recordings themselves into evidence. It instead operates from the premise that putting the recordings before the jury required the reopening of evidence after deliberations had begun.

referred to the calls during their closing arguments and indicated that the jury would be able to listen to the recordings during their deliberations. Everyone—both parties, the court, and the jury—appeared to believe that the recordings were already in evidence before the jury began its deliberations. The only missing step was formally introducing the recordings into evidence. In this situation, the court was within its discretion to reopen the evidence in order to admit them.

This case is similar to *Williams v. United States*, in which we held that the trial court abused its discretion when it refused to admit the transcripts of inconsistent statements that defense counsel had read from during trial. 686 A.2d 552, 556 (D.C. 1996). In that case, like this one, "both defense counsel and [the] prosecution in their closing arguments urged the jury to evaluate" that evidence, and during its deliberations the jury asked to see the transcripts themselves, which apparently had never been formally admitted. *Id.* We concluded that the trial court committed reversible error by refusing to admit the transcripts into evidence, a holding that would seem to encompass the lesser proposition that the trial court here at least acted within its discretion in admitting the recordings into evidence.

Austin counters with *Diaz v. United States*, in which we upheld the trial court's denial of a defendant's motion to admit grand jury transcripts into evidence

after the jury had retired to deliberate. 716 A.2d 173, 182 (D.C. 1998). But the fact that we upheld that denial as within the trial court's discretion does not suggest that it would have been beyond the trial court's discretion to grant the motion. Moreover, *Diaz* distinguished *Williams* on the grounds that "the jury requested" the contested evidence in *Williams* and "[b]oth counsel had 'urged the jury to evaluate . . . the statements.'" *Id.* (quoting *Williams*, 686 A.2d at 556). On both of those points, this case aligns with *Williams*, not *Diaz*, and we discern no abuse of discretion in the trial court's decision to reopen the evidence to formally admit the audio recordings.[5]

**E.**

Finally, Austin argues that the judge erroneously sentenced him for the offense of AWIR while armed, whereas the jury had convicted him only of unarmed

---

[5] To the extent Austin now argues, for the first time on appeal, that the court should have admitted the evidence only in the jury's presence, he invited any error on that score. The court expressly offered to call the jury back in and reopen the evidence in order for the recordings to be admitted, but defense counsel's stated preference was to simply admit them outside the jury's presence so as not to draw further attention to them. "Thus the error that occurred, if any, was invited by defense counsel. It is well established that a defendant cannot well complain of being prejudiced by a situation which he created." *Parker v. United States*, 757 A.2d 1280, 1286-87 (D.C. 2000) (citations omitted).

AWIR.[6] He is correct about that, as the government concedes. We therefore remand to the trial court for resentencing based on Austin's conviction for unarmed, rather than armed, AWIR.

## III.

For the foregoing reasons, we affirm Austin's convictions except that we remand with instructions that the trial court vacate his conviction for ADW and resentence Austin for unarmed, rather than armed, AWIR.

*So ordered.*

---

[6] Austin was initially charged with AWIR while armed, but that charge was later amended to unarmed AWIR, and the jury convicted him of that lesser offense.